**BALTIMORE & O. R. CO. et al. v. UNITED STATES et al.**

United States District Court
S. D. New York.
Nov. 1, 1951.

J. Edgar McDonald, New York City, John F. Reilly, Washington, D. C., R. J. Lally, New York City, L. James Huegel, Baltimore, Md., Henry O. Boynton, Paul v. Miller, Philadelphia, Pa., B. J. Viviano and E. N. Oakes, New York City, for plaintiffs.

John F. Baecher, Sp. Asst. to Atty. Gen., for defendant United States.

Daniel W. Knowlton, Chief Counsel, Washington, D. C., for defendant Interstate Commerce Commission.

Wilbur LaRoe, Jr., Washington, D. C., Leander I. Shelley, Sidney Goldstein and Albert D. Jordan, New York City, Frederick E. Brown, Arthur L. Winn, Jr. and Samuel H. Moerman, Washington, D. C., for intervener-defendant Port of New York Authority.

Milton T. Lasher, Hackensack, N. J., for intervener-defendants Bergen County and Borough of Edgewater.

John F. Finerty, New York City, for intervener-defendant Henry K. Norton, trustee, New York, S. & W. R. Co.

Before MEDINA, Circuit Judge, and NOONAN and DIMOCK, District Judges.

DIMOCK, District Judge.

This action was brought under 28 U.S. C. §§ 1336, and 2321–2325 providing for actions to enjoin, set aside, annul or suspend in whole or in part orders of the Interstate Commerce Commission. It has been heard before a three-judge court pursuant to 28 U.S.C. §§ 2284 and 2321–2325. The complaint prays judgment permanently suspending, enjoining, setting aside and annulling an order of the Interstate Commerce Commission dated January 15, 1951 and its order of June 22, 1951, modifying the previous order by postponing its effective date. The previous order granted the relief sought in a proceeding before it. Docket No. 29891, Borough of Edgewater, N. J. v. Arcade & Attica Railroad Corporation, 280 I.C.C. 121.

On December 18, 1947, the Borough of Edgewater, New Jersey, and the County of Bergen, New Jersey, instituted proceedings before the Commission. Their complaint alleged in part that the full use and development of piers at Edgewater, New Jersey, was hampered by the lack of through routes and joint rates on all classes and commodities, between Edgewater Docks Station [1] on the New York, Susquehanna & Western Railroad Co. [2] and numerous points in the interior, on a parity with rates maintained for such traffic by various railroads, including the plaintiffs in this case, between the same points and piers in Hoboken, New Jersey, served by the Hoboken Manufacturers' Railroad Co. [3]

Hearings in connection with the complaint were held on May 3, 4, 6, and 7, 1948 before an Examiner of the Commission at New York. Following the issuance of a proposed report by the examiner, exceptions thereto were filed by the plaintiffs herein, and, on February 16, 1949, oral argument was held before Division 3 of the Commission. Division 3 issued a report and order on March 23, 1949. After numerous extensions and postponements, the Commission reopened the proceedings for reconsideration and issued, on January 15, 1951, its report on reconsideration, vacated the order issued by Division 3 dated March 23, 1949 and issued a new order. That order is the one attacked in this action.

By the order under review various railroads, defendants in the proceeding before the Commission, were required to establish on or before April 26, 1951 and thereafter "to maintain and apply to the transportation

---

[1] This station is to be distinguished from another station called Edgewater Station. Though both stations are within the Borough of Edgewater, Edgewater Station is what is known as a local station and handles freight for industries and businesses located in the Borough of Edgewater. Edgewater Docks Station, which is the center of the controversy in this case, services Edgewater's waterfront and piers, handling waterborne traffic to and from points beyond the Borough of Edgewater.

[2] Hereinafter the New York, Susquehanna & Western Railroad Co. will be referred to as the Susquehanna.

[3] Hereinafter the Hoboken Manufacturers' Railroad Co. will be referred to as the Hoboken Railroad.

of coastwise, inter-coastal, export, and import freight, over all-rail routes * * * between interior points in official territory[4] and the Edgewater Docks station of the New York, Susquehanna & Western Railroad Company at Edgewater, N. J. rates no higher than those contemporaneously applicable on similar traffic between the same interior points and piers served by the Hoboken Manufacturers' Railroad Company at Hoboken, N. J. * * *".

Subsequent orders of the Commission extended the date of taking effect of the order of January 15, 1951. The order of June 22, 1951, attacked in this action, is one of these.

Thereafter the plaintiffs herein sought further reopening and further hearing and consideration of additional evidence. Their petition was dated April 25, 1951. The specified additional evidence was a Marine Terminal Survey of the New Jersey Waterfront prepared by the Port of New York Authority dated February 10, 1949. By order dated May 21, 1951, the Commission denied their petition.

The complaint in this court was filed on July 13, 1951 and a temporary restraining order was granted by Judge Gregory F. Noonan on August 16, 1951 enjoining the enforcement of the Commission's order dated January 15, and those of June 22 and July 19, 1951 postponing its effective date.

The object of the original proceeding brought by the Borough of Edgewater and the County of Bergen before the Commission was to require the plaintiff railroads, which then carried coastwise, intercoastal, export and import traffic over through routes at joint rates in railroad cars through Hoboken by means of the Hoboken Railroad, to offer the same service through Edgewater Docks by means of the Sus-quehanna. The plaintiff railroads were carrying such traffic on through routes at joint rates through Edgewater Docks by means of lighters and over through routes and at joint rates to Edgewater Station in railroad cars but what the Borough and County wanted was service through Edgewater Docks in railroad cars.

The primary point decided by the Commission was that the lack of these routes and rates caused undue prejudice to Edgewater. That decision, if correct, gave it power under certain statutory provisions, 49 U.S.C. § 3(1), quoted in footnote 8, and § 15(1) which authorizes the Commission to eliminate undue prejudice, to order that Edgewater be furnished the service that it sought.

The Commission also decided that, irrespective of prejudice to Edgewater, the public interest required that the Commission direct the establishment of these routes and rates under power given it by another statutory provision, 49 U.S.C. § 15 (3) quoted in part in footnote 9.

In support of this attack on the Commission's order plaintiffs contend:

1. That Edgewater was already receiving the service that it sought.

2. That the finding of undue prejudice to Edgewater is unsupported by the evidence.

3. That the order unlawfully "short-hauls" the plaintiffs in that

a. Undue Prejudice cases brought under § 3(1) are subject to the prohibition against "short-hauling" in § 15(4) quoted in footnote 7.

b. The Commission failed to make the findings necessary to justify short-hauling under § 15(4).

4. Official territory was defined by the Commission in Southern Class Rate Investigation, 100 I.C.C. 513, 518, as follows: "Official territory, as the term is used in this report, is roughly the territory east of the Mississippi River and north of southern territory (South of the Ohio River and south of the line of the Norfolk & Western from Bristol, Tenn.-Va., to Norfolk, Va., not including the eastern corner of Kentucky served by the Chesapeake & Ohio), including the lower peninsula of Michigan and a small strip of southern Wisconsin. It is the territory in which freight rates are governed by the official classification, and is divided, from west to east, into central territory, the Buffalo-Pittsburgh zone, trunk line territory and New England territory." (Material in parentheses supplied.)

c. The evidence was insufficient to support any such findings.

4. That the Commission's decision is contrary to its established policy for New York Harbor area.

5. That the Commission erred in refusing to reopen the proceeding to take further evidence.

6. That the announced intention of the Susquehanna to move for a modification of the order renders its enforcement unreasonable.

These points will be taken up in order after a discussion of the scope of review.

## Scope of Review.

The scope of the review of the Commission's action is governed by the Administrative Procedure Act, specifically 5 U.S.C. § 1009(e). This section provides: "So far as necessary to decision and where presented the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions * * *. It shall * * * hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; * * * (3) in excess of statuory jurisdiction, authority, or limitations, or short of statutory right; * * * (5) unsupported by substantial evidence * * *. In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error."

The provision of the statute requiring review on "the whole record" has been construed by the Supreme Court in a recent decision, Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S. Ct. 456, 95 L.Ed. 456. It was made clear 340 U.S. at page 488, 71 S.Ct. at page 464 that, "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." With respect to canvassing the whole record the Court added 340 U.S. on page 488, 71 S.Ct. on page 465: "Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*."

The Court concluded that the Administrative Procedure Act directs that courts must now assume more responsibility for the reasonableness and fairness of agency decisions and closed with a statement which may be generalized as directing that the findings of an administrative agency must be set aside when the record before a reviewing court clearly precludes the agency's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.

### 1. The Contention that Edgewater was Already Receiving the Service that it Sought.

Plaintiffs contended in their argument that existing rates to Edgewater are such that it is not being discriminated against. They point to the Commission's statement that there is a substantially complete line of rates, both class and commodity, to Edgewater Station and then cite many tariffs to show that these rates are applicable to coastwise, intercoastal, export and import traffic. They go on to say that the Edgewater Station handles traffic to and from piers at Edgewater Station. Item No. 856 (p. 79) of Trunk Line Territory Tariff Bureau Freight Tariff No. 116–E, I.C.C. No. A–931 which gives the extent of Edgewater Station only refers to private sidings and not to piers. Assuming, however, that piers are included in Edgewater Station and that coastwise and export rates can be applied, they would not include the services of the carrier in loading or unloading the freight at the point of contact with vessels. On the other hand, existing rates on similar traffic would include the services of the car-

rier in such transfers at the public piers in Hoboken. Thus, a definite discrimination does exist.

Beyond that discrimination, existing rates at Hoboken give the shipper an option to have freight loaded at Hoboken piers or moved by lighterage to other points in New York Harbor at the same rates. At Edgewater, however, he would have to pay the higher rate to Edgewater Docks Station in order to obtain lighterage service from there to other points in the harbor. The Commission concluded upon very convincing evidence that both all-rail and lighterage service at parity rates are necessary for the development of port facilities and the record considered as a whole fully supports that conclusion.

Plaintiffs have also pointed to the present availability of parity rates if the traffic is moved over their lines and then by lighter to Edgewater's piers. This overlooks, however, the many items that are either excluded from lighterage service or are subject to added charges if moved by lighter. Nor does it satisfy the necessity for both all-rail and lighterage services which the Commission found to exist.

2. The Contention that the Finding of Undue Prejudice to Edgewater is Unsupported by the Evidence.

In considering the substantiality of the evidence, we shall first consider the evidence concerning the Commission's findings under 49 U.S.C. § 3(1) quoted in footnote 8. It appears to be conceded that discrimination between Edgewater, N.J. and Hoboken, N. J. comes within the terms of § 3(1) making unlawful any undue prejudice to a "locality, port, port district, gateway, transit point", but the point is made that there must exist the same conditions and circumstances and that a difference in rates cannot be held illegal unless it is shown that it is not justified by the costs of the respective services, by their values, or by other transportation conditions. In-

terstate Commerce Commission v. Baltimore & O. R. Co., 145 U.S. 263, 12 S.Ct. 844, 36 L.Ed. 699; United States v. Illinois Central R. Co., 263 U.S. 515, 44 S.Ct. 189, 68 L.Ed. 417.

Similar issues were considered by the Supreme Court in State of New York v. United States, 331 U.S. 284, at page 332, 67 S.Ct. 1207, 91 L.Ed. 1492, and it was there decided that the Commission had not attempted to equalize fortune, opportunities or abilities but that it had eliminated inequalities in rates because it concluded that the differences in them were not warranted by differences in conditions.

There is no question that there are differences in conditions of transportation to and from Edgewater, N. J. on the one hand and Hoboken, N. J. on the other but whether they are such as to justify the discrimination is another question.

Many exhibits, including maps and an aerial photograph, are to be found in the record showing geographic locations topographical features, railroad lines and facilities, waterfront facilities and conditions at Edgewater and Hoboken and commodity traffic handled to and from Edgewater Docks, N. J. This is in addition to considerable testimony concerning the same matters.

Edgewater and Hoboken, N. J. are west of New York City on the New Jersey shore of the Hudson River. The most northerly piers in Hoboken are across the Hudson River from the western end of Twenty-third Street in New York City. The southern boundary of Edgewater is across the river from a point near Ninety-third Street in New York City. The west bank of the Hudson in the terminal area here involved is largely covered by industrial plants, docks, piers and railroad tracks. The waterfront of Edgewater, more than two miles in extent, is well within the free lighterage limits[5] of the New York port district.

5. Certain kinds of freight shipped to or from New York Harbor are entitled to transfer from or to railroad terminals to or from any vessel, pier or public landing place within limits fixed by Rule No. A-

20 Item No. 2585 et seq (p. 127) of Trunk Line Territory Tariff Bureau Freight Tariff No. 116–E, I.C.C. No. A–931.

The claim is made that Edgewater is not in competition with Hoboken and therefore not similarly situated. There is evidence that shows that very little coastwise, intercoastal, export and import traffic is handled through Edgewater Docks. In this connection, the Supreme Court said in New York v. United States, supra, 331 U.S. at page 308, 67 S.Ct. at page 1219, 91 L. Ed. 1492 "If a showing of discrimination against a territory or region were dependent on a showing of actual discrimination against shippers located in these sections, the case could never be made out where discriminatory rates had proved to be such effective trade barriers as to prevent the establishment of industries in those outlying regions."

The present availability of piers at Edgewater for coastwise, intercoastal, export and import traffic and susceptibility of the development of its waterfront was testified to by many witnesses. Other evidence indicated certain limitations on Edgewater's potentialities as a port. It cannot be said, however, to have overcome the evidence showing that there is no substantial difference in waterfront conditions.

Differences in railroad facilities and operation, particularly with respect to the operations of the Susquehanna and the Hoboken Railroad, clearly appear from the evidence. The Hoboken railroad is primarily a switching and terminal railroad and its operations extend over a distance of approximately 1.2 miles exclusive of side and team tracks. The Susquehanna, on the other hand, is primarily a line-haul carrier the services of which range from switching movements to line hauls as great as 82 miles. The record is meager on the question of differences between the costs of the proposed through routes and the costs of the existing routes to Hoboken. Considerable testimony dealt with the facilities for interchange between the Susquehanna and the connecting carriers involved in the proposed through routes and it indicated that they were adequate and practicable. In fact, such routes are in use at present for local traffic to and from Edgewater Station. The proposed routes merely extend them about 1,000 feet to Edgewater Docks Station. The actual obstacle to these joint rates and through routes appears to be a disagreement between the Susquehanna and the other carriers as to the Susquehanna's share of the rates charged for the freight carried over the proposed route according to evidence submitted by the other carriers. While the question of divisions was not before the Commission in this proceeding, nor is it before this Court, this evidence would indicate that the carriers' concern is over revenues, not costs.

To require that Edgewater have railroad facilities and operations identical with those at Hoboken would render the Commission powerless to correct conditions which § 3(1) was designed to prevent. The differences in railroad and other transportation facilities and operations involve matters well within the specialized field of knowledge of the Commission. It can draw from its experience to determine what variables in transportation conditions warrant a difference in rates. Ayrshire Collieries v. United States, 335 U.S. 573, 69 S.Ct. 278, 93 L.Ed. 243. As to such matters, the findings of the Commission carry the authority of expertness which courts do not possess and therefore must respect. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

Our conclusion is that the finding of discrimination is well supported by the evidence.

3. The Contention that the Order Unlawfully "Short-Hauls" the Plaintiffs.

The contention is also made by plaintiffs that they are short-hauled[6] as a result of the through routes ordered by the Commission and that this is contrary to the pro-

---

6. The statutory definition is to "require any carrier by railroad, without its consent, to embrace in such route substantially less than the entire length of its railroad and of any intermediate railroad operated in conjunction and under a common management or control therewith, which lies between the termini of such proposed through route". 49 U.S.C. § 15(4).

visions of §§ 15(3) and (4) of the Interstate Commerce Act, 49 U.S.C. §§ 15(3) and (4). Plaintiffs would prefer to handle traffic to Edgewater Docks by having it move from interior points to their terminals in the port of New York and then transferring it by lighter to the piers at Edgewater. They claim that to order the through routes which require them to transfer freight to the Susquehanna tracks at land interchanges enroute to Edgewater Docks and thus to permit Susquehanna to move the freight all-rail to Edgewater Docks would short-haul them. This must be on the theory that the order requires plaintiff railroads to use substantially less than the entire length of their railroad which lies between the termini of the proposed through routes. The Commission did not pass upon the question whether the plaintiffs were short-hauled but merely held that, if they were short-hauled, the short-hauling was justified under a later proviso in the statute, 49 U.S.C. § 15(4) (b), quoted in footnote 7. We too find it

unnecessary to decide whether or not the plaintiffs have been technically short-hauled but we shall for convenience nevertheless accept plaintiffs' terminology and refer to the effect of the Commission's decision as short-hauling.

Although § 15(4)[7] does forbid short-hauling, it does not do so in absolute terms. Short-hauling is permitted in at least two different cases i. e. first, in undue prejudice cases brought under 49 U.S.C. § 3 (1)[8] and second, where the short-haul order is needed to provide adequate and more efficient or economic transportation under 49 U.S.C. § 15(4) (b).

3a. The Contention that Undue Prejudice Cases Brought Under § 3(1) are Subject to the Prohibition Against "Short-Hauling" in § 15(4).

■ First, the very terms of the prohibition are relaxed by the parenthetical phrase in § 15(4): "except as provided in section 3." Section 3(1) of the Interstate

---

**7.** 49 U.S.C. § 15(4). "In establishing any such through route the Commission shall not (except as provided in section 3, and except where one of the carriers is a water line) require any carrier by railroad, without its consent, to embrace in such route substantially less than the entire length of its railroad and of any intermediate railroad operated in conjunction and under a common management or control therewith, which lies between the termini of such proposed through route, (a) unless such inclusion of lines would make the through route unreasonably long as compared with another practicable through route which could otherwise be established, or (b) unless the Commission finds that the through route proposed to be established is needed in order to provide adequate, and more efficient or more economic, transportation: *Provided, however,* That in prescribing through routes the Commission shall, so far as is consistent with the public interest, and subject to the foregoing limitations in clauses (a) and (b), give reasonable preference to the carrier by railroad which originates the traffic. No through route and joint rates applicable thereto shall be established by the Commission for the purpose of assisting any carrier that would participate therein to meet its financial needs. In time of shortage of equipment, congestion of traffic, or

other emergency declared by the Commission, it may (either upon complaint or upon its own initiative without complaint, at once, if it so orders, without answer or other formal pleadings by the interested carrier or carriers, and with or without notice, hearing, or the making or filing of a report, according as the Commission may determine) establish temporarily such through routes as in its opinion are necessary or desirable in the public interest."

**8.** 49 U.S.C. § 3(1): "It shall be unlawful for any common carrier subject to the provisions of this chapter to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: *Provided, however,* That this paragraph shall not be construed to apply to discrimination, prejudice, or disadvantage to the traffic of any other carrier of whatever description."

Commerce Act, 49 U.S.C. § 3(1), was in part the basis of the proceeding before the Commission and the Commission relied upon it in its decision. This section deals with discrimination and the actual motivation in bringing the proceeding was discrimination in existing rates as between Edgewater Docks, N. J. and Hoboken, N. J. The Commission found that the failure of the railroads, defendants therein, to establish the rates ordered was unduly prejudicial to Edgewater and unduly preferential to Hoboken. To construe the parenthetical phrase as leaving the prohibition against short-hauling in effect despite a Commission finding of undue prejudice and preference under § 3 would be to deprive it of its apparent meaning. We cannot assume that was the intent of Congress in employing such language. The purpose of the parenthetical phrase seems clearly to permit the Commission to short-haul where it is necessary to avoid an undue prejudice or preference made unlawful by § 3. Hence, without more, the Commission was justified in making its short-haul order.

3b. The Contention that the Commission Failed to Make the Findings Necessary to Justify Short-Hauling.

Second, the Commission is permitted by clause (b) of § 15(4) to short-haul a railroad where it finds that the through route proposed is needed in order to provide adequate and more efficient or more economic transportation. This exception to the prohibition against short-hauling is not questioned by plaintiff railroads. They point, however, to further words in the statute and say that through routes must be in the public interest under § 15(3)[9] and that additional limitations must be satisfied, i. e., that the Commission must under § 15(4) give reasonable preference to the carrier which originates the traffic "so far as is consistent with the public interest" and under § 15(4) its purpose must not be to assist any carrier that would participate in the through route to meet its financial needs.

Most of the plaintiffs' contentions in this connection turn on the adequacy of the findings made by the Commission and their support by substantial evidence in the record considered as a whole.

We shall proceed to treat the contention with respect to the adequacy of the findings. The Commission made an ultimate finding in the words of § 15(4) that the through routes were needed in order to provide adequate and more efficient and more economic transportation. A further ultimate finding that they were necessary in the public interest certainly meets not only the qualification of the requirement of preference to the originating carrier: "so far as is consistent with the public interest" in § 15(4) but also conditions of the general through route provision in § 15(3). The argument with respect to the adequacy of these ultimate findings is that the Commission failed to make basic findings in support of them, that it failed to show that it had considered the question of the preference provided by § 15(4) to an originating carrier and that it failed to make any finding that it was not its purpose to assist the Susquehanna to meet its financial needs. The Report of the Commission on reconsideration dated January 15, 1951, 280 I.C.C. 121, contains a careful analysis and evaluation of the evidence and is replete with subsidiary findings laying a complete foundation for its ultimate findings. To say that the Commission must make findings disclaiming undue withholding of the preference due' originating carriers and disclaiming any purpose to assist any carrier to meet its financial needs is to require it to assert that it is not acting contrary to the statute. No such findings are required by the statute although the same § 15(4) does require other findings. If such findings were thought to be desirable, it would seem that similar language would have been inserted in the proviso setting forth the limitations under consideration. The orders of the Commission are presumed valid, *Carolina Scenic Coach Lines v. United States,* D. C., 59 F.Supp. 336,

---

9. 49 U.S.C. § 15(3). "The Commission may, and it shall whenever deemed by it to be necessary or desirable in the pub-
lic interest * * * establish through routes, * * *".

and the burden of showing the invalidating infirmity in a challenged order rests on the plaintiff suing to enjoin it. Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333, Interstate Commerce Commission v. City of Jersey City, 322 U.S. 503, 512, 513, 64 S.Ct. 1129, 88 L.Ed. 1420. The burden has not been met on these issues and the presumption stands.

3c. The Contention that the Evidence was Insufficient to Support Findings Necessary to Justify Short-Hauling.

There are thus in the record findings sufficient to justify short-hauling. We now pass to the question whether there is substantial evidence to support those findings.

The finding under § 15(4) that the proposed routes are needed to provide adequate and more efficient and more economic transportation and the finding under § 15 (3) and § 15(4) that the proposed through routes and joint rates are in the public interest are attacked by plaintiffs who claim that the fact is to the contrary.

 "Public interest" and "adequate, and more efficient or more economic, transportation" do not have the same meaning. Pennsylvania Railroad Co. v. United States, 323 U.S. 588, 65 S.Ct. 543, 89 L.Ed. 478. However, the former phrase does embrace the content of the latter phrase. Public interest has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision, and best use of, transportation facilities. New York Central Securities Corp. v. United States, 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138; State of Texas v. United States, 292 U.S. 522, 54 S. Ct. 819, 78 L.Ed 1402.

Since the evidence concerned in the finding of public interest is much the same as that concerned in the finding that the proposed through routes are needed to provide adequate and more efficient and more economic transportation the substantiality of that evidence in supporting these two findings need be considered but once.

There was evidence, of the public need for new and improved rail-water tranship-

ment facilities in New York harbor. The existence of adequate berthing facilities is not questioned. The testimony was, however, that most of the existing facilities were out-moded and not in condition adequately to take care of the port's tonnage. The need is for modern facilities adapted to the new type of larger ships which have faster unloading gear. Such facilities would permit more efficient and economic rail-water transhipment. Other ports, it was testified, are obtaining much traffic due to the lack of certain facilities in New York Harbor.

As mentioned earlier, a great deal of evidence dealt with Edgewater's waterfront facilities and its susceptibility to port development. An elaborate examination of Edgewater's waterfront appears in the record. Certain handicaps that Edgewater is subject to were shown. Considerable evidence showed that, although Edgewater was not ideal in certain respects, it could be developed as a port given rates on a parity with Hoboken.

The present availability of rates on a parity with Hoboken for traffic moved by lighter to Edgewater Docks has been adverted to earlier and its inapplicability to certain types of freight pointed out. There was a conflict in the testimony whether shippers preferred all-rail to rail and lighter service. Nevertheless, the evidence was strong that both all-rail and lighterage service were necessary in the development of waterfront facilities. Greatest efficiency and economy in steamship operations depend on such complete service.

 The evidence showing that the proposed routes and rates are in the public interest, the inadequacy of existing routes and rates for coastwise, intercoastal, export and import traffic and the greater economy and efficiency of the proposed routes and rates is substantial if not preponderating.

The remaining contentions of plaintiffs are that the Commission's decision is contrary to its established policy concerning short-hauling in the New York Harbor area, that the Commission was arbitrary in refusing to reopen the proceedings to enable plaintiffs to place in the record certain

evidence, and that the announced intention of the Susquehanna to seek a limited modification of the Commission's order inconsistent with its theory make the enforcement of the order arbitrary and unreasonable.

4. The Contention that the Commission's Decision is Contrary to its Established Policy for New York Harbor.

In urging the first contention, the effect of the Commission's established policy on later decisions is not made clear. Be that as it may, all the cases cited by plaintiffs are clearly distinguishable. They largely turn on whether a terminal carrier is to be required to open its terminal facilities and to participate with the line-haul carrier in a joint rate. In the instant case, the terminal carrier, the Susquehanna, supported the complaint before the Commission and is not objecting to the use of its terminal facilities.

5. The Contention that the Commission Erred in Refusing to Reopen the Proceeding.

 The claim of arbitrary action of the Commission in refusing to reopen the proceeding to admit in evidence the Port of New York Authority's Marine Terminal Survey of the New Jersey Water Front is barely worth mention. The petition seeking this relief was dated April 25, 1951, while the report it sought to introduce was dated February 10, 1949, more than two years earlier. No explanation has been given for this lapse of time. The facts contained in the report could have been adequately shown by other means at the hearing in 1947 although admittedly not so strongly as when out of the mouth of an intervener. The Commission has granted many extensions in these proceedings and has given its full consideration to the issues. Petitions for rehearings before administrative bodies are addressed to their own discretion. Interstate Commerce Commission v. City of Jersey City, 322 U.S. 503, 64 S.Ct. 1129, 88 L.Ed. 1420; Carolina Scenic Coach Lines v. United States, D.C., 59 F.Supp. 336. It cannot be said to have been arbitrary in refusing to reopen its hearings.

6. The Contention that the Announced Intention of the Susquehanna to Move for a Modification of the Order Renders its Enforcement Unreasonable.

The contention concerning the announced intention of the Susquehanna to seek limited modification of the Commission's order has no merit. A party's intention to seek modification of a proposed order when it shall be made effective has no bearing on the question whether it shall be made effective.

#### Stay Vacated.

These proceedings have now extended more then three years while the Borough of Edgewater, the County of Bergen and the public have been without the relief ordered by the Commission. A stay is not a matter of right even if irreparable injury might otherwise result to the appellant. There is no serious doubt in our minds of the validity of the Commission's order and no conflict of decisions has been called to our attention. A stay pending appeal, therefore, is not warranted. Virginian Railway Co. v. United States, 272 U.S. 658, 47 S.Ct. 222, 71 L.Ed. 463.

The complaint will be dismissed and the temporary restraining order dissolved.