**NEW YORK, SUSQUEHANNA AND WESTERN RAILROAD COMPANY, Plaintiff,**

v.

**READING COMPANY, Defendant.**

**Civ. A. No. 5318.**

United States District Court
M. D. Pennsylvania.

Oct. 13, 1958.

Leon Leighton, New York City, Maurice S. Cantor, Wilkes-Barre, Pa., for plaintiff.

Alfred W. Hesse, Jr., Philadelphia, Pa., James P. Harris, Wilkes-Barre, Pa., for defendant.

FOLLMER, District Judge.

This declaratory judgment proceeding involving the construction of a provision in a division sheet for division of interline freight revenue between plaintiff, Susquehanna, and defendant, Reading, is, in the light of ruling by the Court of Appeals, now before the Court for determination.

As directed by the Court of Appeals, the Order of Referral to Interstate Commerce Commission has been vacated.

After considering the oral evidence, the exhibits, written briefs and oral arguments, the Court makes the following

Findings of Fact.

1. Plaintiff is a corporation incorporated under the laws of New Jersey. Defendant is a corporation incorporated under the laws of Pennsylvania. The matter in controversy exceeds, exclusive of interest and costs, the sum of $3,000.

2. The division sheet, recognized and referred to by both parties as a contract, was originally executed July 2, 1943, effective with December 1942 Interline Accounts. This sheet included as a Susquehanna Station No. 2265, Edgewater, N. J. Subsequently there was issued Supplement No. 1 to this division sheet wherein on Page 3 there appears the following:

"Page 11 Add: Effective December 1, 1944.
2266 Edgewater Docks (New York
Harbor Lighterage Points)..N. J."

Under caption "Via: Green Pond Jct... N. J." there appears the circled reference Note 20 and uncircled 25, which uncircled 25, as appears on Page 11 of the 1943

sheet, is the designated percentage of division for Station No. 2265, Edgewater, N. J., via Green Pond Jct., N. J. On Page 2 of said Supplement No. 1 sheet under "Explanation Of References" there appears the following:

"Page 2 Add: 'Effective December 1, 1944.

(20) Deduct before prorating the following allowances (See Exception) for the New York, Susquehanna & Western R. R. and divide the balance on Group 25 percents:

4.4¢ per 100 pounds, Minimum $8.80 per car

Exception

On Grain, in bulk 3.3¢ per 100 pounds.

"Page 2 Add: Effective December 1, 1944.

(21) Percents to or from Edgewater Docks, N. J. apply via Green Pond Jct., N. J. only."

---

3. On September 15, 1947, a superseding percentage sheet (Reading Company Joint Percentages No. 563–A) was issued cancelling No. 563 which was issued on July 2, 1943. Listed therein, Page 2, are two stations, Station 2265, Edgewater, N. J., Percentage Group BB, and Station 2266, Edgewater Docks, (New York Harbor Lighterage Points) N. J., Percentage Group 18. Likewise on Page 6, under Susquehanna Stations, there are listed Stations 2245 to 2265, West End, N. J. to Edgewater, N. J., Percentage Group BB, and on separate line Station 2266, Edgewater Docks (New York Harbor Lighterage Points), N. J., Percentage Group 18. On Page 13 under "Explanation of Circle References" there appears the following:

"(18)—Percents to or from Edgewater Docks apply via Green Pond Jct. only. Deduct before prorating 4.4¢ per 100 pounds, minimum $8.80 per car, except on Grain, in bulk 3.3¢ per 100 pounds for the N. Y. S. & W. R. R. and divide the balance on Group BB percents."

4. Seatrain Lines, Inc., is a common carrier by water which transports shipments between the Borough of Edgewater and certain points in the southern or southwestern part of the United States where the shipments are received from or delivered to railroad companies there located.

5. At the time the division sheet in controversy was executed, Seatrain was not located in the Borough of Edgewater and the division sheet or contract provided that in dividing the revenue accruing from joint line hauls between the Susquehanna and Reading, the Reading and the Susquehanna should be entitled to certain percentages, those percentages varying depending upon the Reading station to or from which a shipment was made. These percentages were and are the same in every instance whether the shipment was to the "Edgewater" or "Edgewater Docks (New York Harbor Lighterage Points) N. J." stations of Susquehanna. However, a footnote in the division sheet provides that from revenue accruing on traffic to or from "Edgewater Docks (New York Harbor Lighterage Points) N. J." there shall be deducted before prorating and paid to Susquehanna a specified sum, which at the time of the execution of the agreement was 4.4¢ per 100 pounds and has been increased at various times until the amount is now 9.2¢ per 100 pounds.

6. In the instant proceeding there is only involved the type of nonbreak-bulk traffic handled as above indicated by Seatrain.

7. The only revenue under this contract, the division of which is in dispute, is that involving the Seatrain nonbreak-bulk traffic.

8. At the time the 1944 contract was executed, Seatrain was not located in the Borough of Edgewater. It did not begin its operations there until March 12, 1947.

9. From the time of Seatrain's original location in Edgewater on March 12, 1947, until December 17, 1951, a period of over 4½ years, Susquehanna made no claim for the allowance of the deduction which is at issue in this proceeding.

10. Effective March 3, 1953, Susquehanna issued its own tariff entitled "Official Table of Distances * * * Also List of Junction Points with Connecting Roads." Page 2 of this document contains two lists of stations and in both lists appear both "Edgewater" (Index number 2265) and "Edgewater Docks, N. J. (New York Harbor Lighterage Points)" (Index number 2266) stations. In each station list after "Edgewater" appears "(Note 1.)". On Page 3 of the tariff "Note 1." is set forth under a topic headed "Junction Points" beneath which is the following sentence:

"List of Stations on the N. Y. S. & W. R. R. at which track connections are located for the interchange of freight traffic with other common carriers."

There is then set forth a list of stations in a column entitled "Junction Point" in which "Edgewater" appears and opposite it under the column "Connecting Carrier" is "Seatrain."

11. The parties for a period of 4½ years, up to December 17, 1951, by their actions interpreted the contract as not entitling Susquehanna to the harbor allowance on Seatrain traffic.

12. The point in the Borough of Edgewater where plaintiff delivered the traffic to Seatrain and received the traffic from Seatrain was a point on Seatrain's pier.

13. Traffic interchanged with Seatrain Lines, Inc., requires no water or lighterage service.

14. No lighterage or floatage or loading or unloading service was performed by plaintiff in connection with Seatrain traffic.

15. After December 17, 1951, Reading clerks erroneously allowed the harbor allowance to Susquehanna on some Seatrain traffic, but such errors were corrected by Reading within the time limit prescribed for correction of clerical errors.

16. Susquehanna by its tariffs, embargoes and rate proposals held out, and holds out, Edgewater station as its interchange point with Seatrain.

### Discussion.

Plaintiff admits that in order to be entitled to the deduction before prorating it must establish the fact that Seatrain traffic is interchanged at Susquehanna's Edgewater Docks Station rather than at its Edgewater station. To establish that fact plaintiff relies primarily on the decision and findings of the Interstate Commerce Commission in Borough of Edgewater, N. J., et al. v. Arcade & Attica Railroad Corporation et al., reported in 280 I.C.C. 121 (1951).

In the first place, we have previously indicated that we are here only concerned with nonbreak-bulk traffic. It would seem that the Commission in the Borough of Edgewater case was not concerned with this type of traffic. The Commission recognizing the type of nonbreak-bulk traffic that Seatrain was primarily engaged in handling indicated that that type of traffic was not a part of their concern when it stated, inter alia:

"The railroad terminal and port facilities at Hoboken were overcrowded before the beginning of the recent war. At that time *Seatrain leased* and utilized a pier at Hoboken served by the Hoboken Railroad, and the latter, in order to accommodate

the Seatrain traffic, arranged for the use of yard tracks owned by another railroad and having a capacity of 100 freight cars. During the war, when the terminal at Hoboken became more congested and operating conditions less favorable, Seatrain transferred its transshipping operations to Edgewater where it found suitable space for the construction of a modern pier and ample yard tracks. Before making the transfer, it was assured of railroad rates to and from Edgewater, applicable over the lines of all-rail carriers interchanging traffic with the Susquehanna except one, on carload waterborne traffic moving to and from its ocean vessels without breaking bulk, comparable with rates on like traffic to and from Hoboken. However, at Edgewater it generally is denied commodity rail rates on *break-bulk traffic,* on a parity with those applying to and from Hoboken, and very little break-bulk tonnage is carried. \* \* \* " (Emphasis supplied.)

An action was brought under 28 U.S.C. § 1336 and §§ 2321–2325 providing for actions to enjoin, set aside, annul or suspend in whole or in part orders of the Commission. It was heard before a three judge court.[1] It is significant that the three judge court so interpreted the Commission's opinion when it said: (100 F. Supp. 1002, 1006–1007)

"\* \* \* Assuming, however, that piers are included in Edgewater Station and that coastwise and export rates can be applied, they would not include the services of the carrier in loading or unloading the freight at the point of contact with vessels. On the other hand, existing rates on similar traffic would include the services of the carrier in such transfers at the public piers in Hoboken. Thus, a definite discrimination does exist.

"Beyond that discrimination, existing rates at Hoboken give the shipper an option to have freight loaded at Hoboken piers or moved by lighterage to other points in New York Harbor at the same rates. At Edgewater, however, he would have to pay the higher rate to Edgewater Docks Station in order to obtain lighterage service from there to other points in the harbor. The Commission concluded upon very convincing evidence that both all-rail and lighterage service at parity rates are necessary for the development of port facilities and the record considered as a whole fully supports that conclusion."

The court furthermore stated: (100 F. Supp. 1002, 1008)

"The actual obstacle to these joint rates and through routes appears to be a disagreement between the Susquehanna and the other carriers as to the Susquehanna's share of the rates charged for the freight carried over the proposed route according to evidence submitted by the other carriers. *While the question of divisions was not before the Commission in this proceeding, nor is it before this Court,* this evidence would indicate that the carriers' concern is over revenues, not costs." (Emphasis supplied.)

To support its contention that the Commission found Edgewater Docks to be Susquehanna's sole interchange point in the Edgewater area, plaintiff directs our attention to certain detached excerpts from the Commission's opinion as follows:

a. "As distinguished from its Edgewater station where the Susquehanna handles freight originating at, or destined to, Edgewater locally, that carrier also maintains its Edgewater Docks station which is described in the record as serving all of the Edgewater piers. \* \* \* On its own water-front property, the Susquehanna has two piers, \* \*. The Susquehanna also serves Sea-

train's pier. * * * The remainder of the Edgewater piers are piers of industrial companies owning water-front properties. * * * "
(280 I.C.C. at p. 125)

b. "* * * it will be understood that our findings and order, when and as referring to the Susquehanna's Edgewater Docks station, refer to that station as one that serves the piers on Edgewater's water front * * *." (ibid., at p. 140).

It also quotes a footnote from the three judge court opinion, supra, as follows: (100 F.Supp. 1002, 1004)

"This (Edgewater Docks) station is to be distinguished from another station called Edgewater Station. Though both stations are within the Borough of Edgewater, Edgewater Station is what is known as a local station and handles freight for industries and businesses located in the Borough of Edgewater. Edgewater Docks Station, which is the center of the controversy in this case, services Edgewater's waterfront and piers, handling waterborne traffic to and from points beyond the Borough of Edgewater."

These excerpts, we feel, are taken completely out of context and must be considered in the light of the above observations that in neither of those instances was the Commission nor the Court interested or concerned with the matter of nonbreak-bulk traffic.

The problem before the Commission in the Borough of Edgewater case was to equalize rates through Edgewater with the existent rates at Hoboken and in which loading, unloading and lighterage were essential elements.

The Commission in the Borough of Edgewater case also stated as follows: (280 I.C.C. 125)

"As distinguished from its Edgewater station where the Susquehanna handles freight originating at, or destined to, Edgewater locally, that carrier also maintains its Edgewater Docks station which is described in the record as serving all of the Edgewater piers. This station is also held out by the Susquehanna's tariffs as one through which shipments originating at or destined to any points within the lighterage limits of the harbor are handled in lighterage service to the extent that 'there are facilities for handling' such shipments. On its own water-front property, the Susquehanna has two piers, the one called pier A and the other the coal dock pier. The latter pier is at present leased to the Pittston Company, engaged in shipping coal to Europe. The Susquehanna also serves Seatrain's pier. Since removing its transshipping operations from Hoboken to Edgewater, Seatrain has transported little break-bulk traffic, such traffic being checked by the unfavorable rate structure at Edgewater. The remainder of the Edgewater piers are piers of industrial companies owning water-front properties.

* * * * * *

"It will be understood that our findings and order contemplate and require the performing of lighterage service by the Susquehanna in connection with the through routes and joint rates determined to be necessary and desirable in the public interest. As earlier mentioned, the Susquehanna, by its tariffs, holds out its Edgewater Docks station as a station through which shipments originating at or destined to any points within the lighterage limits of the harbor are handled in lighterage service to the extent that 'there are facilities for handling' such shipments. We will expect the qualifying words to be eliminated from the tariffs, and it will be understood that our findings and order, when and as referring to the Susquehanna's Edgewater Docks station, refer to that station as one that serves the piers on Edgewater's water front and also, by means of lighterage service, all points within the free

lighterage limits of New York Harbor where vessels handling coastwise, intercoastal, export, or import traffic may dock." (280 I.C.C. 140)

It would therefore seem that Edgewater Station has a definite fixed situs while Edgewater Docks Station is merely a term applied to any number of piers in the New York Harbor area handling break-bulk traffic.

It must be assumed that the Commission was familiar with its own decision in I. C. C. v. Hoboken Manufacturers' Railroad Co. (234 I.C.C. 114) and the Supreme Court's affirmance thereof in 320 U.S. 368, 64 S.Ct. 159, 164, 88 L.Ed. 107, in which the latter held, inter alia, that "the carrier is entitled to 'just compensation only for what it actually does.' "

That the issues now before us were not pertinent nor necessary to the decision in the Borough of Edgewater case is confirmed by memorandum decision of the New York Supreme Court, Appellate Division, First Department, in New York, Susquehanna and Western Railroad Company v. Central Railroad Company of New Jersey, 1957, 3 A.D.2d 999, 163 N,Y.S.2d 567, 568,[2] in an identical situation in which the court held that the findings of the Commission in the Borough of Edgewater case were not res judicata as to the issues presented in the case then before it.

We are convinced that the Commission throughout the Borough of Edgewater case was fully aware of the Seatrain nonbreak-bulk situation and was by its language limiting its findings as to Edgewater Docks Station to break-bulk traffic requiring loading, unloading or lighterage service and there was no intention of disturbing the then existing arrangement as to nonbreak-bulk traffic[3] or the division sheets then in existence. Their subsequent renewal by the parties confirm this. Consequently, for the reasons above indicated, the findings of the Commission in the Borough of Edgewater case can in no sense be considered as res adjudicata or in the nature of an equitable estoppel in the instant case.

■ This brings us to the construction of the contract between the parties as set forth in the several division sheets.

Susquehanna's tariff referred to in Findings of Fact No. 10, supra, indicated that there was no difference in mileage between Edgewater Station and Edgewater Docks Station. It is therefore obvious that the New York Harbor deduction was intended by the parties to compensate for an additional service which Susquehanna would perform when the traffic moved to or from the Edgewater Docks Station. The parties have designated that additional service by the use of the parenthetical expression "New York Harbor Lighterage Points" which

2. The opinion reads as follows:
   "In granting a declaratory judgment, construing the provisions of agreements among certain railroads for division of freight revenues, the court below, in deciding for the plaintiff, held that the findings of the Interstate Commerce Commission in Borough of Edgewater, N. J. v. Arcade & Attica R. R. Corp. (280 I.C.C. 121), which were reviewed by a three-judge statutory court in Baltimore & Ohio R. R. Co. v. United States, D.C., 100 F.Supp. 1002, were *res judicata.* It is our conclusion that those findings of the Commission were not *res judicata* as to the issues presented in the instant action. Absent the controlling effect of these findings, there is insufficient proof in the record upon which the court could determine the rights and liabilities of the parties under the disputed agreements.

Judgment unanimously reversed and the complaint dismissed without prejudice. Settle order on notice."

3. The Commission (280 I.C.C. 121, 127) states:
   " * * * Before making the transfer, it (Seatrain) was assured of railroad rates to and from Edgewater, applicable over the lines of all-rail carriers interchanging traffic with the Susquehanna except one, on carload water-borne traffic moving to and from its ocean vessels without breaking bulk, with rates on like traffic to and from Hoboken. However, at Edgewater it generally is denied commodity rail rates on break-bulk traffic, on a parity with those applying to and from Hoboken, and very little break-bulk tonnage is carried. * * *"

immediately follows the designation of the Edgewater Docks Station and is required to be read in connection with the note against that station which provides for the New York Harbor Lighterage deduction. Susquehanna has not only failed to carry its burden of explaining away the foregoing but has resisted any explanation by the parties of the meaning of "lighterage".

Furthermore, on Page 2 of said tariff sheet in giving the alphabetical and geographical list of stations of Susquehanna, there appears the following:

"Index
No.
2265 Edgewater
2266 Edgewater Docks
    (New York Harbor Lighterage Points)".

And on Page 3 under caption "Junction Points" setting forth the list of stations on Susquehanna at which track connections are located for the interchange of freight traffic with other common carriers, there is listed "Edgewater" and under "Connecting Carrier" "Seatrain." Likewise, on various embargo sheets Susquehanna has repeatedly indicated with reference to Edgewater Docks, N. J., New York Harbor Lighterage service an exception as follows:

"Consignees who have own lighterage pier facilities, * * *.",

which would clearly include Seatrain traffic as an exception to Edgewater Docks consignments.

The situation may be summarized as follows:

Plaintiff's position is that under the division contract there is no ambiguity and that under Note (18) with reference to Edgewater Docks Station there can be no doubt as to Susquehanna's right to a deduction before prorating the charges. I agree with plaintiff that there is no ambiguity in these contracts but do not agree that the contracts warrant the conclusions that it draws therefrom. On the contrary, as we have indicated throughout the discussion, the problem we are dealing with here is the construction of a contract which had its inception in a division sheet effective December 1942, which referred only to a Station 2265—Edgewater, which was followed by a supplement effective December 1, 1944, in which there was added Susquehanna Station 2266, Edgewater Docks (New York Harbor Lighterage Points) N. J., with a notation (20) as to the deduction for Susquehanna before prorating in connection with collections on shipments to the foregoing Edgewater Docks Station.

Seatrain began its operations in the Borough of Edgewater on March 12, 1947, and the division contract was renewed on September 15, 1947, wherein no actual change was made in the various listings or conditions except that Note (20) in the former supplement now appears as part of Note (18)

It is significant that from the time Seatrain entered and began its operations in the Borough of Edgewater on March 12, 1947, until December 1951, Susquehanna made no claim for the deduction prior to prorating on this Seatrain traffic and there is no indication during this period that it considered the contract ambiguous. On the other hand, to the contrary, its interpretation was clearly that of the defendant that this contract did not provide, nor intend to provide, for any deduction before prorating as to Seatrain, —in other words, that Seatrain traffic was not considered by the parties as consigned to Edgewater Docks. It is further shown that any question of ambiguity was eliminated from this contract by the continued recognition by Susquehanna of Edgewater Station as the interchange point for Seatrain traffic. As late as 1953 in its Tariff S.W. 26–B dated January 31, 1953, effective March 3, 1953, referred to as "Official Table Of Distances", in which it shows that it recognizes no difference in distance between the two Edgewater stations and specifically refers to Edgewater Station as the Seatrain Junction and in an embargo issued originally December 14, 1951, effective December 17, 1951, covering the descrip-

tion of Edgewater Docks, N. J. (New York Harbor Lighterage), issued the embargo for the very purpose of indicating that an exception thereto was a consignee such as Seatrain who had its own lighterage pier facilities. And this same position is maintained in an amendment of this embargo issued as late as February 17, 1956, which did not change the original provisions but merely added another provision.

In the light of the above, it would seem to be perfectly clear that Susquehanna has not met its burden of showing that it is entitled to this deduction before prorating, especially in view of the findings of the Commission, confirmed by the Supreme Court in I. C. C. v. Hoboken Railroad Company, supra, wherein the Court specifically held that the carrier is entitled to just compensation only for what it actually does. Applying that principle to the nonbreak-bulk Seatrain traffic, which is the only issue before us in connection with the division contracts herein involved, it is clear that Susquehanna performs no such service for which it is entitled to compensation, and I can find nothing to indicate that when the parties executed the division contracts they had any such gratuitous compensation in mind.

### Conclusions of Law.

1. This Court has jurisdiction over the instant controversy.

2. Susquehanna is not entitled under the Reading-Susquehanna division agreement to the harbor allowance on any traffic moving to or through Edgewater station.

3. Borough of Edgewater v. Arcade & Attica R. Corp., 273 I.C.C. 711, 280 I.C.C. 121, is not res judicata, nor does it constitute judgment by estoppel, of the station location for division purposes of the Susquehanna-Seatrain interchange point.

"4. Susquehanna is not precluded by "Borough of Edgewater" from maintaining before, or establishing and maintaining after, the date of the order an interchange point with Seatrain at Edgewater station.

5. The division agreement between Reading and Susquehanna does not obligate Reading to pay Susquehanna the 4.4¢ (as variously increased) from revenue derived from Seatrain traffic, and Susquehanna shall account and pay to Reading the Reading's share of amounts which Susquehanna has withheld as the harbor allowance from Seatrain traffic revenue.

6. Defendant is entitled, pursuant to 28 U.S.C. § 2202, to judgment for whatever sums are found to be due the defendant in accordance with the provisions of Conclusion 5 above.

Let Order be submitted in accordance herewith.