The **PENNSYLVANIA RAILROAD COMPANY** et al., **Plaintiffs,**

v.

**UNITED STATES** of America and the
Interstate Commerce Commission,
Defendants.

Civ. A. No. 35250.

United States District Court
E. D. Pennsylvania.

June 15, 1965.

Edward A. Kaier, Philadelphia, Pa., for plaintiffs.

Drew J. T. O'Keefe, U. S. Atty., Joseph R. Ritchie, Jr., Asst. U. S. Atty., Philadelphia, Pa., Nicholas deB. Katzenbach, U. S. Atty. Gen., Archibald Cox, Sol. Gen., John H. D. Wigger, Dept. of Justice, Antitrust Div., Washington, D. C., for the United States.

Robert W. Ginnane, Gen. Counsel, I. K. Hay, Deputy Gen. Counsel, I. C. C., Washington, D. C., for Interstate Commerce Comm'n.

Karl C. Grannan, Dept. of Agriculture, Washington, D. C., for intervening defendant.

Walter Milbourne, Pepper, Hamilton & Scheetz, Philadelphia, Pa., Arthur L. Winn, Jr., LaRoe, Winn & Moerman, J.

Raymond Clark, LaRoe, Winn & Moerman, Washington, D. C., for Port of New York Authority.

Samuel Mandell, Chief, Div. of Franchises, New York City, for City of New York.

M. W. Wells, Maguire, Voorhis & Wells, Orlando, Fla., James J. Leyden, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for Florida Citrus Comm'n and others.

J. Edgar McDonald, New York City, Liebert, Harvey, Herting & Short, Philadelphia, Pa., for New York Central R. R.

J. T. Clark, Gen. Atty., Cleveland, Ohio, Liebert, Harvey, Herting & Short, Philadelphia, Pa., for Erie-Lackawanna R. R.

Before HASTIE, Circuit Judge, and BODY and HIGGINBOTHAM, District Judges.

## OPINION OF THE COURT

HASTIE, Circuit Judge.

This action by several railroads seeks judicial invalidation of an order, issued by the Interstate Commerce Commission under sections 1(5) and 3(1) of the Interstate Commerce Act. In substance, the order requires the plaintiffs to cease, desist and abstain from charging new and increased rates for long haul shipments of fresh fruits and vegetables from the southern and southwestern areas of the country to stations in New York City, which are higher than their rates applicable to transportation from the same points of origin to northern New Jersey stations. Port of N. Y. Authority v. Aberdeen & Rockfish R. R., 1964, 321 I.C.C. 738, 755.

The affected New York and New Jersey stations are all within a single metropolitan area and heretofore have constituted a rate group within which there has been parity of long haul rates. The long haul concept is limited to transportation over distances greater than 150 miles. The disputed order neither fixes rates nor precludes any increase or decrease of group rates. It merely invalidates a newly created rate differential between different destinations within the metropolitan area.

The order is based upon an accompanying report wherein the Commission has found that the new rate differential unjustifiably disrupts the integrity of a long-established rate group and, therefore, is both "unjust and unreasonable", within the meaning of section 1(5) of the Interstate Commerce Act, and "unduly preferential" to the New Jersey area and "unduly prejudicial" to the New York area, within the meaning of section 3(1) of the Act.

The new tariffs involved in this case have the effect of splitting the New York rate group into two rate areas, one of which includes some 100 stations in New Jersey and the other, some 25 stations in New York.[1] Before this innovation, group rates for shipments of various vegetables from a representative Florida station to the New York metropolitan area had been approximately $400 per carload, with minor variations for different commodities. The challenged new tariffs increase the rates for representative carload shipments to New York stations by $57. However, even with this increase it is undisputed, and the Commission has found, that the revenue produced by the new New York rates is less than the carriers' out-of-pocket expenses for transportation and delivery to certain New York stations.

Almost all of the evidence of higher New York costs, urged in justification of this breaking of the rate group, related to one New Jersey station and one station consisting of three New York piers. Accordingly, in considering whether the new rate structure was unduly prejudicial to New York and preferential to New Jersey, the Commission examined and determined relative costs incurred by the carriers from the point in New Jersey

1. Greater gradation of rates, established for some of the affected commodities, does not require special consideration in this opinion since the reasoning with reference to two level rates is equally applicable.

where the line haul from the south ends until freight becomes available to the consignee either at a Jersey City station or across the river at a New York pier. The Commission dealt separately with "terminal" costs, which are costs of movement—switching and, where necessary, floatage—from the end of the line haul to the point of delivery, and "station" costs incurred in providing suitable facilities for delivery. The Commission found that terminal costs for representative movements to New York piers are about $14.14 per carload higher than terminal costs for Jersey City delivery. It also found additional differences in costs of providing and maintaining station facilities at different points of delivery. "Ordinary" costs of providing station facilities at the New York piers were found to be $12.29 per carload higher than Jersey City station costs. And the costs of special facilities and conveniences provided at New York pier stations add an additional $36.82 to the costs of carload deliveries at this point.

Certainly these differences are substantial, since in the aggregate they amount to about 15% of the total charge for transporting vegetables from the south to New York. Moreover, as has been pointed out, the increased rates, while compensating for this differential, will still yield the carrier less than the actual cost of the services rendered.

On the other hand, the Commission expressed its proper concern to avoid, if it fairly could, the sacrifice of general advantages inherent in group rates as well as the imposition of any demonstrable particular disadvantage upon the New York area through an increase in fruit and vegetable rates applicable to New York stations only.

The history and general advantages of the rate group concept, with its requirement of long haul rate parity for all stations within a single metropolitan area, have been frequently expounded. In The New York Harbor Case, 1917, 47 I.C.C. 643, the Commission recognized as a fact the essential industrial and commercial unity of the metropolitan district centering on the Port of New York, saying:

"The industrial district of northern New Jersey is so near the city of New York and so densely populated that the whole region, both in New York and in New Jersey, is commonly referred to as 'the metropolitan district'. Many thousands of people who are employed in New York have their homes in New Jersey, and every morning and evening the ferries, subway 'tubes,' and suburban trains are crowded with commuters traveling between their homes and their places of business. In this respect northern New Jersey is quite as much a part of New York as is Brooklyn or Staten Island. Moreover * * throughout the metropolitan district there are industries engaged in the manufacture of the same articles, drawing their raw materials from the same source, and disposing of their products in common markets." 47 I.C.C. at 668–669.

It then pointed out that the establishment and maintenance of parity of long haul freight rates to and from numerous stations dispersed throughout such an extensive industrial or commercial center is a widespread practice of long standing. Thus, group rates, applicable throughout the Oakland—San Francisco area, the area around Hampton Roads which includes the cities of Norfolk, Portsmouth and Newport News, and the great industrial and commercial complex centering on Chicago are examples of this nationwide, long continued and judicially approved practice. See Ayrshire Collieries Corp. v. United States, 1949, 335 U.S 573, 69 S.Ct. 278, 93 L.Ed. 243; Lighterage Cases, 1934, 203 I.C.C. 481; City of Newport News, Va. v. Aberdeen & Rockfish R. R., 1929, 159 I.C.C. 159; Oakland Chamber of Commerce v. Southern Pac. Co., 1925, 100 I.C.C. 55. The Commission also set out certain justifying general advantages that inhere in group rates:

"Not only does this practice greatly simplify the publication of tariffs, to the convenience of both the carriers

and the public, but the application of a common rate to a number of points in the same general territory effects an equality of opportunity which is usually most desirable; and this is particularly true where the points in question produce and ship the same commodity or derive their raw materials from the same sources. Producers in all parts of the port of New York are manufacturing goods for sale in common markets throughout the world." 47 I.C.C. at 712.

In addition to these general considerations, the Commission found that at least one significant economic consequence, peculiar to this case, was likely to result from the challenged differential rate increase. The matter involved is the location of a principal metropolitan center for the wholesale marketing of fruits and vegetables. The record shows that, for various reasons, the relocation of the Washington Market, a 35 acre marketing complex in lower Manhattan, is under serious consideration and is likely to occur. Moreover, in the Commission's words, "both the City of New York and the favored [by the new rates] New Jersey municipalities hope to secure the wholesale produce market for the metropolitan area for their respective localities". The Commission also found that a $57 per carload rate differential is "large enough to influence the decision as to relocation of the wholesale produce market". On the record, we cannot say that these findings and conclusions are either unreasonable or arbitrary.

█ Thus, the Commission had to resolve a conflict between the legitimate concern of the carriers, claiming urgent need to reduce losses, and the public interest in rate parity throughout the metropolitan area. In these circumstances, the Commission properly considered whether the carriers' need for more revenue could be met by means other than breaking the rate group.

The record indicates that much of the high station cost at the New York piers represents the valuable service of providing extensive and specially adapted station facilities which enable a consignee to display his merchandise to prospective purchasers at the point of unloading. The Commission reasoned that a carrier may lawfully recover these and any other extraordinary New York station costs by making special accessorial charges, which are not part of the group rate, as well as unloading charges [2] where the assignee freely elects to have the carrier perform this service. The record provides no basis for challenging the Commission's conclusion that the extraordinary New York station costs, some $36.82 of the $49.11 total station cost differential, can thus be recovered without disturbing the established group rates.

The remainder of the aggregate cost differential, consisting of the $14.14 difference in terminal costs and the $12.29 difference in ordinary station costs, presents other considerations and possibilities. Although the plaintiffs aver that the exigencies of competition with motor carriers prevent raising New Jersey rates $57 to coincide with the increased New York rates, the Commission suggests that some significant part of the differential which would remain, after recoupment of extraordinary station costs, could be recovered by a modest increase of the uniform group rates, although the record does not show how much rates can be increased without undue injury to the competitive position of rail shipment in relation to trucking. The record also suggests that there may be inequity in the division of revenue from long haul charges among connecting carriers. The delivering carriers' costs, including station and terminal costs, are said to have quadrupled while line haul costs have not quite doubled. To the extent that the delivering carriers' plight reflects such inequity, remedies other than breaking the group rate are available. On the

---

2. Such separate unloading charges were approved for the New York pier stations in Increased Freight Rates, 1958, 304 I.C.C. 289. The present opinion indicates that, upon a proper showing, these charges may be increased.

present record we cannot say that such expedients would not be practical.

In this connection, it must be recognized that the basic concept of group rates unavoidably contemplates and necessitates the absorption in uniform long haul group rates of some demonstrable differences in costs of delivery at various stations within a group. Commenting upon this, the Commission has said:

> "The practice of disregarding the cost of a specific service in constructing rates for long hauls, while including it in the rates for shorter distances, is such a common one that it may well be accepted as one of the established principles of rate making in this country. * * * The reason for this general practice is, of course, that when the hauls are long the cost of the specific terminal or switching service is spread over such great distances that the cost of that service per mile is negligible; or, in other words, that the cost of that service is so small when compared with the revenue which the carrier derives from the long haul that it can be absorbed without encroaching unduly upon the carrier's earnings." The New York Harbor Case, 47 I.C.C. at 701.

The same point is made in Baltimore Chamber of Commerce v. Ann Arbor R. R., 1929, 159 I.C.C. 691. Applying this principle the Commission's opinion in the present case indicates its judgment that even the entire $14.14 difference in terminal costs, an amount which is about 3 percent of the total established group rate, is within the legitimate reach of this concept. We cannot say that this exercise of experienced and expert judgment is unreasonable.

 We conclude, therefore, that the Commission's order is adequately supported by a justified conclusion that unnecessary and undue preference and prejudice to geographic subdivisions of the New York metropolitan area is caused by the rate differential in controversy. It is unnecessary therefore, to consider the Commission's separate conclusion that the increased rates for shipment to New York stations are "unjust and unreasonable" within the meaning of section 1(5), even though they remain less than the carriers' costs, because they break the New York rate group. Cf. Virginian Ry. v. United States, 1926, 272 U.S. 658, 665, 47 S.Ct. 222, 71 L.Ed. 463; but see New York v. United States, 1947, 331 U.S. 284, 344, 67 S.Ct. 1207, 91 L.Ed. 1492.

This opinion incorporates this court's findings of fact and conclusions of law.

An order will be entered denying the plaintiffs relief and dismissing their complaint.