AYRSHIRE COLLIERIES CORP. ET AL. *v.* UNITED
STATES ET AL.

No. 25.   Argued November 12, 15, 1948.—Decided January 3, 1949.

574

*Earl B. Wilkinson* argued the cause for Ayrshire Collieries Corp. et al., appellants. With him on the brief was *J. Alfred Moran.*

*Carson L. Taylor* argued the cause for the Chicago, Milwaukee, St. Paul & Pacific Railroad Co., appellant. With him on the brief were *A. N. Whitlock* and *M. L. Bluhm.*

*Daniel W. Knowlton* argued the cause for the United States and the Interstate Commerce Commission, appellees. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Bergson* and *Edward Dumbauld.*

*Erle J. Zoll, Jr.* argued the cause for the Alton Railroad Co. et al., appellees. With him on the brief were *A. E. Funk,* Attorney General of Kentucky, *M. B. Holifield,* Assistant Attorney General, *Charles W. Stadell* and *J. E. Marks. Richard F. Wood* was of counsel for Belleville Fuels, Inc. et al., appellees.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is an appeal, 38 Stat. 219, 220, 28 U. S. C. §§ 45 and 47a, 43 Stat. 938, 28 U. S. C. § 345 (4), from a decree of a three-judge District Court, which dismissed as with-

out merit two complaints seeking to set aside a rate order of the Interstate Commerce Commission.[1]

Bituminous coal is produced in great quantities in Indiana, Illinois and western Kentucky. In each State there are producing areas that have long been grouped for rate-making purposes. These groups or districts are the Brazil-Clinton, the Linton-Sullivan, the Princeton-Ayrshire, and the Boonville in Indiana; the Northern Illinois, the Fulton-Peoria, the Springfield, the Belleville, and the Southern in Illinois; and the Western in Kentucky. Group rates have been established by the carriers so that all mines within each producing area are accorded the same rates to the same consuming destinations.[2] The result is that comparative distances of the mines in one producing area from a particular consuming destination are commonly disregarded in fixing the group rate. But the Commission has long concluded that such a system of rate making for coal and other natural resources encourages competitive production and a more even development of an area.[3]

The present litigation involves group rates for carload lots from the foregoing groups in Indiana, Illinois, and

---

[1] A prior decree sustaining this order of the Commission was reversed by the Court because one member of the three-judge District Court had not participated in the decision. *Ayrshire Corp.* v. *United States,* 331 U. S. 132.

[2] Another characteristic of coal rate structures has been the rate differentials. For example, Brazil is the base group in Indiana on coal traffic to the Illinois and Wisconsin destinations involved in this litigation. Hence the rates, expressed in cents per ton, from the other Indiana groups are stated in terms of differences from the Brazil group rate.

[3] See *Hitchman Coal & Coke Co.* v. *Baltimore & O. R. Co.,* 16 I. C. C. 512, 520; *Waukesha Lime & Stone Co.* v. *Chicago, M. & St. P. R. Co.,* 26 I. C. C. 515, 518; *Wisconsin & Arkansas Lbr. Co.* v. *St. Louis, I. M. & S. R. Co.,* 33 I. C. C. 33, 37–38; *Public Utilities*

Kentucky to Rockford, Freeport, Dixon and other points in northern Illinois and to Beloit, Wisconsin.

The order under attack in this case resulted from two proceedings before the Commission which were heard and considered together on the same record. One was an investigation in which carriers proposed certain increases in rates for carload lots of bituminous coal from some of the Indiana groups to Beloit, Wisconsin, and from all of the Indiana groups to designated Illinois destinations. Like increases in the Illinois intrastate rates to the same Illinois destinations were also sought. These proposed increases have been suspended until disposition of the proceeding. The other proceeding was an investigation instituted by the Commission, on complaint, into the intrastate carload rates from the Illinois groups to the same Illinois destinations to determine whether they were discriminatory, preferential, and prejudicial against interstate commerce and in favor of intrastate commerce.

These proceedings are only a recent chapter in the problem of adjustment of the coal rates for this region.

The Illinois Commerce Commission ordered a reduction of the intrastate rates in 1930. This resulted in a reduction of certain interstate rates from Indiana and western Kentucky to Rockford and other northern Illinois points. The Interstate Commerce Commission refused to require an increase in intrastate rates to the important Illinois destinations involved here unless the rates from the Indiana groups to the same destinations were increased.[4]

---

*Commission* v. *Oregon Short Line R. Co.*, 33 I. C. C. 103, 106; *Southwestern Interstate Coal Operators' Assn.* v. *Arkansas W. R. Co.*, 89 I. C. C. 73, 84–85. And see *New York Harbor Case*, 47 I. C. C. 643, 712; *Illinois Commerce Commission* v. *United States*, 292 U. S. 474, 486.

[4] See *Intrastate Rates on Bituminous Coal in Illinois*, 182 I. C. C. 537, 549–550.

Subsequently the Commission found that the rates from the Illinois, Indiana and western Kentucky groups to Beloit, Wisconsin, were in the main not unreasonable but that they were unduly prejudicial to Beloit and unduly preferential to Rockford, if they exceeded the rates from the same origins to Rockford by more than 25 cents. The Commission also found on further hearing that the rates from certain of the Illinois groups to Beloit, Wisconsin, were not unreasonable but that they were unduly prejudicial to Beloit and unduly preferential to Rockford to the extent that they exceeded the Rockford rates by more than 15 cents. The Commission allowed the carriers to increase the rates to Rockford or to reduce the rates to Beloit, or both, in order to relate the rates to Beloit 15 cents over Rockford. But the intrastate rates to Rockford had been prescribed as a maximum by the Illinois Commission and therefore could not be increased. Also to increase the interstate rates without similar increases from the Illinois groups would be disruptive of the rate structure built on the group basis. Accordingly the rates to Beloit were reduced.[5]

The carriers subsequently proposed increases in the rates from the Indiana groups and the Illinois groups to Rockford and other Illinois points and, with certain exceptions, from the Indiana groups to Beloit, Wisconsin. These increases conformed to the 15-cent relation be-

---

[5] The history of this rate problem is briefly summarized by the Commission in its report on the present case. 263 I. C. C. 179. For earlier aspects of it see *Intrastate Rates on Bituminous Coal in Illinois*, 182 I. C. C. 537; *Fairbanks-Morse & Co.* v. *Alton & S. R.*, 195 I. C. C. 365, 251 I. C. C. 181; *Illinois Coal Traffic Bureau* v. *Ahnapee & W. R. Co.*, 204 I. C. C. 225; *Coal to Illinois and Wisconsin*, 232 I. C. C. 151. And see *Coal from Indiana to Illinois*, 197 I. C. C. 245, 200 I. C. C. 609, the order in which, as we discuss hereafter in the opinion, was held invalid by *United States* v. *Chicago, M., St. P. & P. R. Co.*, 294 U. S. 499.

tween Rockford and Beloit but placed the rates (both interstate and intrastate) more nearly at the general level of interstate rates in that territory.

One other fact must be mentioned if the present posture of this rate problem is to be understood. After the Illinois intrastate rates were reduced in 1930 and after the carriers' unsuccessful effort to have the earlier ones reestablished, the Milwaukee road proposed to reduce its single-line rates from mines in the Brazil and Linton groups which it serves to Rockford, Freeport and other intermediate Illinois points by the amount of the Illinois intrastate reduction. The Commission ordered the proposed rate to be cancelled. The Court affirmed a decree of a District Court which permanently enjoined the order of the Commission. *United States* v. *Chicago, M., St. P. & P. R. Co.*, 294 U. S. 499.

Since that time the rates of the Milwaukee from origins on its line in the Brazil and Linton groups to Rockford and other intermediate points in Illinois have been lower than the contemporaneous rates of carriers serving other origins in these respective groups to the same destinations, with the exception of the Illinois Central which in 1936 published rates from the Linton group to Rockford and other intermediate Illinois points on its lines on the same basis as the Milwaukee's single-line rates.

The Milwaukee and the Illinois Central serve only a part of the mines in the Brazil and Linton groups. But they carry coal from other mines in those groups even though their lines do not reach them, since they are either connecting carriers of lines that do or destination carriers. They are therefore parties to many joint rates. But the joint rates do not reflect reductions which the Milwaukee and Illinois Central made in their single-line rates. And the rate increases proposed, and suspended by the Commission on the present proceedings, continued that previ-

ous relationship. Moreover the proposed dual basis of rates to Rockford and other Illinois destinations reached by the Milwaukee was proposed to be extended to Beloit, which previously had enjoyed the same rates from all the mines in the Brazil and Linton groups.

As we have noted, the new proposed rates respected the 15-cent differential of Beloit over Rockford. The result was a substantial increase in the joint-line rates from the Brazil and Linton groups to Beloit as well as to Rockford. But Milwaukee's single-line rates were increased 15 cents to Rockford and none to Beloit. The result would be to accord to mines in the Brazil and Linton groups that were on the Milwaukee lines rates lower to Beloit by 17 and 12 cents, respectively, than accorded the other mines in the two groups. Furthermore the new proposed rates would establish a dual basis of rates to Beloit from the Princeton group as well.

The Commission disapproved the dual basis of rates. It considered what would be the fair and reasonable rate relations as between the respective origins in the several groups and as between the groups themselves. It found that present and proposed rates of the Milwaukee and Illinois Central from Indiana to the northern Illinois destinations would result in unjust discrimination as between shippers and receivers of coal and undue preference and prejudice as between the origins in the Brazil and Linton groups and as between the respective Indiana groups. It made the same findings as respects the Milwaukee's proposed rates from the Brazil, Linton and Princeton groups to Beloit; and in that connection it also found that those rates would result in undue preference and privilege as between the Indiana groups on the one hand and the Illinois groups on the other. The Commission went on to specify rates which it approved. It ruled that the proposed rates would be unreasonable to

the extent that they were above the approved rates.[6]  263
I. C. C. 179.

We agree with the District Court that the complaints
must be dismissed.

*First.* It is contended that the Commission in this pro-
ceeding had authority to determine the lawfulness only
of the proposed rates, not of the present rates.

This proceeding is an investigation and suspension pro-
ceeding under § 15 (7) of the Interstate Commerce Act,
44 Stat. 1447, 49 U. S. C. § 15 (7). That section, which
gives the Commission broad authority upon complaint or
its own initiative to investigate and determine the law-
fulness of any new rate,[7] provides that "after full hearing,
whether completed before or after the rate . . . goes into
effect, the commission may make such order with ref-

---

[6] The order entered by the Commission in the proceeding to deter-
mine whether the intrastate rates were unjustly discriminatory
against interstate commerce is not under attack here. It required
the carriers to desist from practices which the Commission found
to be discriminatory and to establish and maintain, for the intrastate
transportation of coal, rates no lower than the approved rates.

[7] "Whenever there shall be filed with the commission any schedule
stating a new individual or joint rate, fare, or charge, or any new
individual or joint classification, or any new individual or joint
regulation or practice affecting any rate, fare, or charge, the com-
mission shall have, and it is hereby given, authority, either upon
complaint or upon its own initiative without complaint, at once,
and if it so orders without answer or other formal pleading by the
interested carrier or carriers, but upon reasonable notice, to enter
upon a hearing concerning the lawfulness of such rate, fare, charge,
classification, regulation, or practice; and pending such hearing and
the decision thereon the commission, upon filing with such schedule
and delivering to the carrier or carriers affected thereby a statement
in writing of its reasons for such suspension, may from time to time
suspend the operation of such schedule and defer the use of such
rate, fare, charge, classification, regulation, or practice, but not for
a longer period than seven months beyond the time when it would

erence thereto as would be proper in a proceeding initiated after it had become effective."

The power of the Commission to deal with the situation as if the proposed new rates had become effective is necessarily a comprehensive one. It seems too plain for argument that such broad authority is ample for the modification of either proposed or existing rates or both. The power granted the Commission under § 15 (1) to deal with rate schedules already effective supports that view.[8] For once the Commission finds the rate to be unjust or

otherwise go into effect; and after full hearing, whether completed before or after the rate, fare, charge, classification, regulation, or practice goes into effect, the commission may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective."

[8] "That whenever, after full hearing, upon a complaint made as provided in section 13 of this part, or after full hearing under an order for investigation and hearing made by the Commission on its own initiative, either in extension of any pending complaint or without any complaint whatever, the Commission shall be of opinion that any individual or joint rate, fare, or charge whatsoever demanded, charged, or collected by any common carrier or carriers subject to this part for the transportation of persons or property as defined in the first section of this part, or that any individual or joint classification, regulation, or practice whatsoever of such carrier or carriers subject to the provisions of this part, is or will be unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial, or otherwise in violation of any of the provisions of this part, the Commission is hereby authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate, fare, or charge, or rates, fares, or charges, to be thereafter observed in such case, or the maximum or minimum, or maximum and minimum, to be charged, and what individual or joint classification, regulation, or practice is or will be just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent to which the Commission finds that the same does or will exist, and shall not thereafter publish, demand, or collect any rate, fare, or charge for such transportation other than the rate, fare, or charge so prescribed, or in excess of the maximum

unreasonable or unjustly discriminatory or unduly preferential or prejudicial or otherwise unlawful, the Commission is granted the power under § 15 (1) to determine and prescribe the just and reasonable rate. The Commission is not bound either to approve or disapprove *in toto* the new rates that are proposed. It can modify the proposal in any respect and require that the proposed rates as modified or wholly different rates be substituted for the present ones. That has been the view of the Commission since the beginning;[9] and we think it is the correct one.

The same result obtains as respects the Milwaukee's single-line rates from origins on its lines in the Brazil and Linton groups to Beloit, Wisconsin. The Milwaukee had not proposed any change in those rates. But those rates had been republished in the proposed schedules. They were among the rates suspended by the Commission. And the Commission's order of investigation cited the Milwaukee tariff that contains those rates. Hence the Commission sought to bring them into the investigation and gave Milwaukee all the notice to which it was entitled. That the Commission had authority to include them seems clear to us. Even though we assume they are not "new" rates within the meaning of § 15 (7), they are rates "demanded, charged, or collected" within the meaning of § 15 (1).

*Second.* Section 2 of the Act makes it unlawful for a carrier to receive from one person a greater or less compensation for transporting property than it receives from another for doing a "like and contemporaneous service in the transportation of a like kind of traffic under

---

or less than the minimum so prescribed, as the case may be, and shall adopt the classification and shall conform to and observe the regulation or practice so prescribed."

[9] See *Advances in Rates—Western Case,* 20 I. C. C. 307, 314; *Lignite Coal from N. Dakota,* 126 I. C. C. 243, 244.

substantially similar circumstances and conditions." [10] It is pointed out that the purpose of this section is to enforce equality between shippers of like commodities over the same line or haul for the same distance and between the same points.[11]  This requirement, it is argued, has not been met in the present case since there is no finding that any of the coal from any origin point to any destination was being charged a higher rate than other coal from the same origin point to the same destination moving over the same line under substantially similar circumstances and conditions.  The contention would be well taken if the Commission was not warranted in treating all places within a particular group or district as one origin point.  Whether or not the Commission was warranted in doing so, depends primarily on the legality of its action in gathering together various origin points into one rate group for rate-making purposes.

As we have noted [12] that has been an historic method of building coal rate structures.  The Commission followed that method in this case because in its opinion

---

[10] "That if any common carrier subject to the provisions of this part shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property, subject to the provisions of this part, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful."

[11] See *Interstate Commerce Commission* v. *Baltimore & O. R. Co.*, 145 U. S. 263, 280; *Interstate Commerce Commission* v. *Alabama Midland R. Co.*, 168 U. S. 144, 166; *Barringer & Co.* v. *United States*, 319 U. S. 1, 6.

[12] See note 3, *supra*.

such a rate structure was necessary to afford consumers, coal operators, and carriers a fair opportunity to compete in the purchase, sale and transportation of coal from the mines in the various groups or districts to the destinations in question. The Commission's power so to act is not challenged here. Yet once the legality of the grouping of mines for rate purposes is accepted, the result is clear. For the protection of one shipper against unjust discrimination in favor of another within the same group is as clearly within the purpose of § 2 as the protection of one factory against unjust discrimination in favor of another in the same community.

The Milwaukee and Illinois Central were granting more favorable rates to some origins than to others in the same groups or districts. Their single-line rates from mines on their own lines were much lower than joint-line rates from other mines in the same group to the same destinations. The latter are rates published by other carriers and in which Milwaukee and Illinois Central join. Milwaukee and Illinois Central therefore are parties to an arrangement which results in some mines getting lower rates than other mines in the same group on shipments to the same destinations.

The question remains whether that preferential treatment of shippers at some origins was an unjust discrimination within the meaning of § 2.

The single-line rates of Milwaukee and Illinois Central from the Linton group to northern Illinois destinations were 12 cents lower than the joint-line rates to the same points from other mines in the Linton group. The like differential as respects the Brazil group was 17 cents. The proposed schedules continued that dual basis of rates and extended it to Beloit, Wisconsin. The Commission made what seems to us a permissible inference, that rates favorable to the mines on the single-rate routes played an important part in getting the great bulk of

586

the tonnage from the roads having the higher joint rates. Thus Milwaukee served only 4 of the 30 mines in the Brazil group and only 9 of the 31 in the Linton group. But in what the Commission called a representative period, Milwaukee handled under its single-line rates over 95 per cent of the tonnage moving from Brazil to Rockford and over 78 per cent of that from Linton to Rockford. The Commission concluded that the maintenance of the dual basis of rates therefore had an important bearing on the future opportunities of shippers within the respective groups to market their coal in the destination territory. It found that there was severe competition in marketing coal in this territory and that a differentially related and finely balanced rate structure on the coal was necessary in order to meet the needs of the consuming public, the mine operators, and the carriers. For, in general, all of the mines in these groups produce coal of the same quality and grade. A difference of a few cents per ton in the transportation charge is normally sufficient to divert a coal contract from one mine to another. Yet the Commission found that the transportation conditions over the single-line routes do not differ materially from those over the joint-line routes to the same destinations from other mines in the same group; that there is no important difference in the average distances over those respective routes.

The latter findings, especially the one respecting the similarity of transportation conditions, are severely challenged as being without any support in the evidence. These findings, when judged by the classic examples of unjust discrimination between shippers, leave much to be desired. But we think they are adequate in this case. They reflect an intimate acquaintance by the Commission with the grouping of mines for rate-making purposes. See 263 I. C. C., p. 196. The groups are themselves designed to equalize competitive opportunities. The lo-

cation of the mines, their distances from destination territory, the transportation conditions over the lines that serve the various origins within a group—these are all factors which bear on the determination of what mines shall be pulled together into one group. The Commission can draw from its long experience with these groupings to determine whether any variables in transportation conditions warrant a difference of rates as between mines within one group to a common destination. Or to state it otherwise, the attack here could not succeed unless it were on the respective groupings themselves. The appellants, of course, claim the right to initiate rates within the zone of reasonableness. See *United States* v. *Chicago, M., St. P. & P. R. Co., supra.* But the Commission holds that when that power is used to establish a dual basis of rates for this coal mining region, it defeats the system of grouping by unjustly discriminating against some shippers and in favor of others in the same group. The Commission's conclusion that only by the establishment and maintenance of a single-rate basis can that unjust discrimination be avoided is an informed judgment based on a complex of many factors. It cannot be successfully challenged on this record unless the whole system of rate making on a group basis is undermined. But no such major project is undertaken.

What we have just said also disposes of the attack which is made on the findings and conclusion of the Commission that the present and proposed system of dual rates creates an undue preference and prejudice as between the origins in the Brazil and Linton groups in violation of § 3 (1) of the Act.[13]

---

[13] "It shall be unlawful for any common carrier subject to the provisions of this part to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traf-

*Third.* The Commission found that the differentials maintained by the Milwaukee and Illinois Central as between certain of the Indiana groups constituted an undue preference and prejudice in violation of § 3 (1) of the Act.[14]

The Commission found that the differential, Linton over Brazil, should be 10 cents. This is the standard differential, in effect generally to the northwest. It found that the standard differential, Princeton over Linton, was 7 cents. Milwaukee's differential in the former would be 22 cents; and the differential of the Milwaukee and Illinois Central in the latter would be 19 cents. The main attack of appellants on this phase of the case is the Commission's conclusion that these differentials are greater than those warranted by the/respective differences in distances. Facts are adduced to show that they fairly reflect differences in distances.

But the Commission made plain that in considering the whole problem of rate relations presented by this case it did not rely strictly upon distance. Distance was a factor but it was not controlling. The Commission deemed its task to be the creation of a rate structure that would afford a fair opportunity to compete in the purchase, sale and transportation of the coal from the various mines to the destinations in question.

fic, in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever . . . ."

[14] "The Milwaukee and the Illinois Central join in rates from the Princeton and Boonville groups to these northern Illinois destinations which reflect differences between those groups on the one hand, and the Brazil and Linton points served by those two respondents on the other, that are substantially greater than the so-called standard differentials and greater than are warranted by the respective differences in distance."

The propriety of that action of the Commission is determinative of another phase of the case as well. It goes to the heart of appellants' objections to the differentials prescribed by the Commission as fair and reasonable as between the Indiana groups and the Illinois groups.

The Commission approved rates from the Indiana groups to twelve Illinois destinations which averaged $1.95 from Brazil, $2.05 from Linton, and $2.12 from Princeton-Boonville. These rates, the Commission found, compared favorably with the proposed rates to the same destinations from the Illinois groups,[15] apart from exceptions not now material.

The chief problem of the Commission in this case was to provide a rate structure which would afford fair and reasonable relations of rates to northern Illinois destina-

---

[15] The Commission in determining maximum reasonable rates from the Fulton-Peoria group to Iowa destinations developed the so-called Midland scale. See *Midland Electric Coal Corp.* v. *Chicago & N. W. R. Co.*, 232 I. C. C. 5. It used the so-called Indiana-Illinois scale for the same purpose in connection with certain Indiana groups to eastern-central Illinois destinations. See *Coal Trade Assn.* v. *Baltimore & O. R. Co.*, 190 I. C. C. 743. In the present case the Commission made certain adjustments in those scales, see 263 I. C. C. at 186, and used them in the comparison of the approved Indiana rates with the approved Illinois rates. Those combined rates for Indiana to twelve northern Illinois destinations average 86.1 per cent of the Indiana-Illinois scale and 70.7 per cent of the Midland scale, while the combined rates for the Illinois groups to those destinations averaged 85.4 per cent and 70.3 per cent of those scales.

The Commission approved rates of $2.22 from Brazil to Beloit, Wisconsin, $2.32 from Linton, and $2.39 from Princeton-Boonville, rates which the Commission found compared favorably with the present rates from the Illinois groups to Beloit. Taken as a whole, the approved rates from Indiana to Beloit averaged 94.3 per cent of the Indiana-Illinois scale and 77.1 per cent of the Midland scale, while the combined present rates from the Illinois groups to Beloit average 92.9 per cent and 76.6 per cent of the respective scales.

tions, both as between the respective origin groups and as between Indiana groups and Illinois groups. There had been historically no fixed relation either between the former or the latter. And the appearance of a dual basis of rates greatly distorted the picture. The Commission did in this case what the Court pointed out in *United States* v. *Chicago, M., St. P. & P. R. Co., supra,* at 510, it had not done there, *viz,* it adjudged the fairness of the relation subsisting between Illinois and Indiana rates.

Appellants however contend that what the Commission did was wholly arbitrary. They point to instances where the rate from an Indiana group is more than the rate from an Illinois group even though the haul is shorter. They say that what the Commission did was to adjust the rates not to compensate for the transportation service rendered but to favor Illinois groups over Indiana groups. They give illustration after illustration of the inconsistencies between the specific rates, assuming, as the Commission found, that the transportation conditions which were involved were the same. From that argument appellants seek to make two points—(1) that the rates approved by the Commission do not reflect group differentials designed to eliminate discrimination and preference and (2) that, even though they do, individual rates are established that are wholly arbitrary in violation of the principle that each destination is entitled to a reasonable rate.

We cannot deny the Commission authority to use averages as a measure of the relationship between the rates of the Indiana groups on the one hand and the Illinois groups on the other. The averages would be some indication of the closeness of the alignment. The important comparison here is in the regional or group differentials. These differentials in the present case were not designed so as to be faithful to the factor of distance. The Commission followed the common practice in giving diminish-

ing weight to distance and increasing weight to competition as the length of the haul increased. The Commission said, 263 I. C. C. at 204,

"In approving the foregoing rate relations, we have kept in mind the importance to consumers, coal operators, and railroads of relating these differentially related coal rates, not strictly upon distance, but so as to afford all concerned a fair opportunity to compete in the purchase, sale, and transportation of coal from Illinois and Indiana mines to these destinations. The rates between the various origin groups in these fields have never been made with primary regard for distance, and to so make them now would have the effect eventually of eliminating practically all competition between most of them, a result which would be highly undesirable to the consumer, whose interests we may not disregard." [16]

[16] The Commission made this additional observation concerning the weight it gave to distance, 263 I. C. C. at 204,

"And in according such weight to distance as seemed to us to be fair and reasonable, we have also kept in mind that the average distances of record, and as used in this report, especially from Illinois mines, frequently reflect seeming inconsistencies from the same group to destinations in close proximity to each other. For example, Amboy is located south of and about 12 miles over the Illinois Central and across country less distant from the Illinois groups than Dixon, but the average shortest tariff-route distance from the Springfield group is 9 miles greater and from the southern Illinois group 1 mile greater to the former than to the latter. By use of the short tariff routes the distance to Amboy is 9 miles greater from Springfield and 7 miles greater from southern Illinois than to Dixon. These variations in distance are due to the different routes used and also to the fact that frequently the group rate applies from a larger number of origins to one destination than to another. Thus, to Dixon the Springfield rate is published from 61 origins on 15 originating railroads, but to Amboy the rate applies from only 23 origins on 8 railroads. So also, the southern Illinois rate applies from 75 origins on 7 roads to Dixon and 65 origins on 5 roads to Amboy. The

There is no doubt, therefore, that the Commission believed that the competitive factor was an important one in considering this problem of rate relationships. The result may, as appellants contend, favor some Illinois mines over Indiana as respects certain markets. That would seem to follow, for example, from the elimination of the low single-line rate that the Commission found to be disruptive of rate relations between these groups. But it does not indicate that the rates approved by the Commission were unlawful. That might be established by showing, for example, that the Commission gave weight only to the competitive factor. Yet all that appellants attempt here is to show that discrepancies in rates are not warranted by any difference in transportation conditions or in distance. That is not enough provided the Commission was justified in considering the element of competition.

We think it was. Rate structures are not designed merely to favor the revenues of producers and carriers. The Commission has the consumer interest to safeguard as well.[17] And when it undertakes to rationalize the interests of the three, great complexities are often encountered. The economics of the bituminous coal industry have baf-

---

variations in distance thus brought about are much greater from Illinois groups than from Indiana groups. It is plain, therefore, that comparisons based on distance, especially as between Indiana and Illinois groups to particular destinations, cannot be accepted as controlling, but must be evaluated with the above facts in mind."

[17] The consumer interest traditionally has been prominent in the Commission's consideration of the type of problem presented here. See *Andy's Ridge Coal Co.* v. *Southern R. Co.*, 18 I. C. C. 405, 410; *Waukesha Lime & Stone Co.* v. *Chicago, M., & St. P. R. Co.*, supra, at 518, 519; *Wisconsin & Arkansas Lumber Co.* v. *St. Louis, I. M. & S. R. Co.*, supra, at 37, 38; *Southwestern Interstate Coal Operators' Assn.* v. *Arkansas W. R. Co.*, supra, at 85; *Coal to Illinois and Wisconsin*, supra, at 167, 169.

fled even experts. We would depart from our competence and our limited function in this field if we undertook to accommodate the factors of transportation conditions, distance and competition differently than the Commission has done in this case. That is a task peculiarly for it. In fashioning what the Commission called a differentially related and finely balanced rate structure for this coal, there is no place for dogma or rigid formulae. The problem calls for an expert, informed judgment on a multitude of facts. The result is that the administrative rate-maker is left with broad discretion as long as no statutory requirement is overlooked. Yet that is, of course, precisely the nature of the administrative process in this field. See *Board of Trade* v. *United States,* 314 U. S. 534, 548; *New York* v. *United States,* 331 U. S. 284, 347–349.

*Fourth.* Appellants argue that the Commission acted beyond its authority because it did not afford the carriers alternative methods of removing the discrimination which was found to exist. See *Texas & Pacific R. Co.* v. *United States,* 289 U. S. 627. And Milwaukee argues that the Commission was without power to direct it to cease from granting the undue preference found to exist between its single-line rate and the higher joint-line rates, since it had no control over the latter.

This is not a case like *Texas & Pacific R. Co.* v. *United States, supra,* where the Commission issues a so-called alternative order directing the carriers to remove an unjust discrimination or undue preference which has been found. That kind of order leaves a choice to the carriers whether to eliminate the unlawful practice by raising one rate, lowering the other, or altering both. But as we recently held in *New York* v. *United States, supra,* at 342, that rule is not applicable where the Commission itself undertakes to correct the unlawful practice by pre-

scribing the just and reasonable rate. The Commission has taken that action here. As we noted above, the present proceeding was one under § 15 (1) and § 15 (7). Section 15 (1) gives the Commission power to determine and prescribe the just and reasonable rate once it finds, *inter alia,* that any rate charged is unjustly discriminating or unduly preferential or prejudicial. The Commission in the present case has exercised that power. It has prescribed approved rates. They are rates which in the Commission's judgment will eliminate the unjust discrimination and undue preference found to exist in this rate structure. Hence the question whether Milwaukee effectively controlled the higher joint-line rates is irrelevant here. *New York* v. *United States, supra.*

Finally it is suggested that the order is invalid because the Commission did not find that the preferential rates were noncompensatory. But once a forbidden discrimination or preference in rates is found, the Commission may remove it even though the rates are within the zone of reasonableness. *New York* v. *United States, supra,* at 344.

*Affirmed.*