**ST. MICHAELS UTILITIES COMMIS-
SION and Commissioners of St.
Michaels, Maryland, Petitioner,**

v.

**FEDERAL POWER COMMISSION,
Respondent.**

Delmarva Power & Light Company, Del-
marva Power & Light Company of
Maryland, and Delmarva Power &
Light Company of Virginia, and Ac-
comac-Northampton Electric Coopera-
tive, Choptank Electric Cooperative,
Inc., and Delaware Electric Coopera-
tive, Inc., Intervenors.

**STOCKTON LIGHT & POWER COMPA-
NY OF MARYLAND, and Stockton
Light & Power Company of Virginia,
Petitioners,**

v.

**FEDERAL POWER COMMISSION,
Respondent.**

Delmarva Power & Light Company, Del-
marva Power & Light Company of
Maryland, and Delmarva Power & Light
Company of Virginia, and Accomac-
Northampton Electric Cooperative,
Choptank Electric Cooperative, Inc., and
Delaware Electric Cooperative, Inc., In-
tervenors.

Nos. 10829, 10833.

United States Court of Appeals
Fourth Circuit.

Argued March 10, 1967.

Decided May 1, 1967.

Spencer W. Reeder, St. Michaels, Md., for petitioner in No. 10,829.

George B. Mickum, III, Washington, D. C. (W. Edgar Porter, Salisbury, Md., Henry C. Ikenberry, and Richard E. Rubenstein, Washington, D. C., on brief), for petitioners in No. 10,833.

William H. Arkin, Atty., Federal Power Commission (Richard A. Solomon, Gen. Counsel, and Howard E. Wahrenbrock, Sol., Federal Power Commission, on brief), for respondent.

John W. T. Webb, Salisbury, Md. (Webb, Anderson & Burnett, Salisbury, Md., Robert E. May, Francis H. Caskin, and May, Shannon & Morley, Washington, D. C., on brief), for intervenors utility companies.

William C. Wise, Washington, D. C. (Arthur Dean Betts, Georgetown, Del., Wilbert Merriken, Denton, Md., and Baxley T. Tankard, Eastville, Va., on brief), for intervenors cooperatives.

Before BELL and WINTER, Circuit Judges, and HARVEY, District Judge.

HARRISON L. WINTER, Circuit Judge:

Delmarva Power & Light Company, and its subsidiaries,[1] supply wholesale and retail electric service in Delaware, nine counties of the Eastern Shore of Maryland, and two counties of the Eastern Shore of Virginia. By the final order in the consolidated rate and complaint proceedings which we are asked to review,[2] the Commission found generally that Delmarva's rates were just and reasonable, and that Delmarva's form of rate was not unreasonable and did not subject any person to undue prejudice or disadvantage within the meaning of § 205(b) of the Federal Power Act. 16 U.S.C.A. § 824d(b). Delmarva makes, demands and receives a different rate from its so-called Tariff Customers from the rate charged its so-called Cooperative Customers; Tariff Customers consist of municipalities and investor-owned distribution companies, and Cooperative Customers are Cooperatives. The Commissioners of St. Michaels, Maryland, a municipal corporation ("St. Michaels"), the St. Michaels Utilities Commission, a municipal public utilities commission, and Stockton Light & Power Company of Maryland, and Stockton Light & Power Company of Virginia (collectively "Stockton"), all of which initiated the consolidated proceeding before the Commission by their written complaints, seek review of the Commission's order because they allege the form of the rate is not supported by substantial evidence and is unduly prejudicial. St. Michaels and Stockton are Tariff Customers, which are charged a higher rate than Cooperatives. In an earlier proceeding, we denied a motion to adduce additional evidence.[3]

1. Delmarva Power & Light Company will be referred to as "Delmarva." Delmarva was formerly known as Delaware Power and Light Company. Its subsidiaries, at the time of the proceedings before the Commission, were known as The Eastern Shore Public Service Company of Maryland and The Eastern Shore Public Service Company of Virginia. The subsidiaries are now known as Delmarva Power & Light Company of Maryland and Delmarva Power & Light Company of Virginia. Delmarva and its subsidiaries are operated as a single integrated electric utility.

2. St. Michaels Utilities Commission, et al. v. The Eastern Shore Public Service Company of Maryland, et al., 35 F.P.C. —— (1966).

3. St. Michaels Utilities Commission, et al. v. Federal Power Commission, 370 F.2d 403 (4 Cir. 1966).

The rate charges as shown on the filed tariff are set forth in the margin.[4] It is conceded that, based upon the quantities purchased at the established rates, the average cost of a kilowatt hour of electricity to Cooperative Customers is less than the average cost of a kilowatt hour of electricity to Tariff Customers. This difference was fully recognized by the Commission, which found that during the 1962–1963 test period purchases by the Tariff Customers constituted 8.5% of total system electric revenues from wholesale sales, that Delmarva properly treated Tariff Customers and the Cooperatives as members of different wholesale classes, that a rate of return of 6% for Delmarva was fair and reasonable and that Delmarva would earn a rate of return of from 5.74% to 6.07%, depending upon which peak responsibility method of allocation was employed, on service to its Tariff Customers while it would earn 5.56% or 5.75%, depending upon federal income tax rates, on service to Cooperative Customers. In dealing with the form of the rate, the Commission concluded (Delmarva being referred to as "Delaware Power," its then corporate name):

"Delaware Power has stated that the computed average rate paid by the Cooperatives during the twelve-month period ending June 30, 1963, was 9.7 mills per kwh as against a computed average rate of 11.9 mills paid by the Tariff Customers. The record shows that the average kwh costs of the smaller Tariff Customers, such as St. Michaels and Stockton, are higher than the group average because of the inability of these smaller customers to take advantage of the tariff discounts for large volume purchases. In great measure the difference in rate structure between the Cooperatives and

4. The tariff provides the following schedule of charges for cooperatives:
"Demand Charge
$475.00 for the first 300 kilowatts of billing demand
    1.10 per kilowatt for the next 9,700 kilowatts of billing demand
    1.00 per kilowatt for all over 10,000 kilowatts of billing demand
Energy Charge
First 6,000,000 Kilowatt hours:
    0.90¢ per kilowatt hour for the first 100 hours' use of billing demand
    0.80¢ per kilowatt hour for the next 200 hours' use of billing demand
    0.60¢ per kilowatt hour for all over 300 hours' use of billing demand
All over 6,000,000 Kilowatt Hours Regardless of Hours' Use:
    0.55¢ per kilowatt hour"
The rates charged tariff customers are as follows:
"Rate Table
    The monthly bill shall be the sum of the Demand and Energy charges but not exclusive of other charges or credits which are integral with this Schedule.
Demand Charge
First
        100 Kilowatts of Billing Demand         $205.00
Next
        200 Kilowatts of Billing Demand at       1.70 per Kw
Over
        300 Kilowatts of Billing Demand at       1.20 per Kw
Energy Charge
First 100 Hours' Use of Billing Demand, but not to exceed 150,000 Kwh
    at 1.75¢ per Kwh
Next 200 Hours' Use of Billing Demand, but not to exceed 150,000 Kwh
    at 1.25¢ per Kwh
Remaining Kilowatt-hours up to 300 Hours' Use of Billing Demand at
    1.00¢ per Kwh
All Kilowatt-hours in excess of 300 Hours' Use of Billing Demand at
    0.80¢ For Low Tension Service at 0.70¢ For High Tension Service
Where the Buyer takes service at High Tension voltage, owns and maintains
    the entire substation including all apparatus necessary for utilization of
    service, consumption over 300 Hours' Use of Billing Demand and over
    2,500,000 Kwh per month shall be billed at 0.60¢ per kilowatt-hour."

the Tariff Customers can be accounted for by the actual difference to the Delaware Power System in the costs of serving these two wholesale groups. Thus, Delaware Power's rate of return on its service to the Tariff Customers exceeds its rate of return on its service to the Cooperatives by only 0.89 percent, when computed on the basis of staff's cost of service data, adjusted by the examiner's cost of service and allocation findings. In addition, as the record plainly shows, the lower rates charged the Cooperatives can be be attributed to the superior bargaining power which the Cooperatives have demonstrated in their negotiations with the Delaware Power System by reason of their apparent ability to build their own generating and transmission system. We have given weight to this bargaining power in Southwestern Public Service Company, Opinion No. 451 (1965).

\* \* \* \* \* \*

" \* \* \* the operations of Stockton are so much smaller than those of the Cooperatives, as to indicate that Stockton's relatively higher average charges are due essentially to the small scale of its purchases rather than to the classification as a Tariff Customer.

\* \* \* \* \* \*

"We accordingly find that the record in this proceeding does not support the charge that the Delaware Power System has unduly discriminated against its Tariff Customers by charging them rates which are excessively higher than those .charged the Cooperatives." (footnotes eliminated)

Overall, St. Michaels and Stockton attack the Commission's order on the grounds that there was lacking substantial evidence of record to support the discrimination in rate approved by the Commission, and that the Commission illegally took into consideration improper factors to justify the discrimination.

■ Discrimination in rates is prohibited by § 205(b) of the Federal Power Act. 16 U.S.C.A. § 824d(b).[5] This provision is closely modeled on the Interstate Commerce Acts, 49 U.S.C.A. § 1 *et seq.* The purpose of the latter is " \* \* \* to prevent favoritism by insuring equality of treatment on rates for *substantially similar services* \* \* \*," (emphasis supplied), United States v. Chicago Heights Trucking Co., 310 U.S. 344, 351, 60 S.Ct. 931, 935, 84 L.Ed. 1243 (1940). See also, Ayrshire Collieries Corp. v. United States, 335 U.S. 573, 69 S.Ct. 278, 93 L.Ed. 243 (1949); L. T. Barringer & Co. v. United States, 319 U.S. 1, 63 S.Ct. 967, 87 L.Ed. 1171 (1943); I. C. C. v. Delaware L. & W. Co., 220 U.S. 235, 31 S.Ct. 392, 55 L.Ed. 448 (1911); I. C. C. v. Alabama Midland R. Co., 168 U.S. 144, 18 S.Ct. 45, 42 L.Ed. 414 (1897). Thus, it has been held that differences in rates are justified where they are predicated upon differences in facts—costs of service or otherwise—and where there exists a difference in rates which is attacked as illegally discriminatory, judicial inquiry devolves on the question of whether the record exhibits factual differences to justify classifications among customers and differences among the rates charged them.

Much of the opinion of the Commission in this case was devoted to consider-

5. "§ 824d. Rates and charges; schedules; suspension of new rates
"(b) No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any *undue* preference or advantage to any person or subject any person to any *undue* prejudice or disadvantage, or (2) maintain any *unreasonable* difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service." (emphasis supplied)
Section 206(a) of the Act, 16 U.S.C.A. § 824e(a), authorizes the Commission when it finds after hearing, *inter alia,* that any rate is "unjust, unreasonable, unduly discriminatory or preferential" to determine the "just and reasonable rate" and to fix the same by order.

ing whether an initial classification between Tariff Customers and Cooperative Customers was justified, whether the rates charged each such classification was proper, and whether there was an undue discrimination against the Tariff Customers. Our examination of the record satisfies us that the essential findings of the Commission in these regards are fully supported, and we affirm the Commission's order.

A brief résumé demonstrates the factual underpinnings to support the conclusions that customers should be classified into two groups and a different rate charged each group. The Tariff Customers are the old-established private or municipal electric utilities which serve the towns and settled areas of the sparsely populated, predominantly rural, area of Delmarva's operations. The Cooperative Customers were established by farmers, under the provisions of the Rural Electrification Act, 7 U.S.C.A. § 901 et seq., to obtain service where it was unobtainable from the Tariff Customers; and the Cooperative Customers were organized after the major transmission lines of Delmarva were constructed. As a result, Delmarva makes delivery of electrical energy directly to the load centers of most of its Tariff Customers; the Cooperative Customers have a substantial investment in transmission lines, the Tariff Customers very little. Cooperative Customers provide their own substations and take energy at voltages determined by Delmarva for its own convenience and economy. For Tariff Customers, Delmarva furnishes substations and makes its service available at a voltage mutually agreed upon with the customers. Also, the load characteristics of the two classes of customers differ. The average peak load of the Tariff Customers coincides with Delmarva's total system peak, while the average peak of the Cooperative Customers falls at other times.

These differences are reflected in the cost of service to Delmarva for each of the two classes of customers. From the portion of its opinion previously quoted, the Commission found that the computed average rate paid by the Cooperative Customers was 9.7 mills per kwh, while the computed average rate paid by the Tariff Customers for the same period was 11.9 mills per kwh. A study in evidence showed that Delmarva would have had an additional cost of 0.32 mills per kwh of power delivered to the Cooperative Customers had Delmarva been required to construct and maintain transmission lines to deliver power to them at their load centers as it does in regard to its Tariff Customers. The cost to Delmarva of its investment in and maintenance of substations for the benefit of its Tariff Customers has been estimated from data in the record to amount to 0.76 mills per kwh. Similarly, the cost to Delmarva of its investment in the physical facilities of its rate base required to accommodate the peak loads of its Cooperative Customers was shown, by various studies, to vary from 0.42 to 2.37 mills per kwh. In short, the record discloses evidence to show that there is a substantial difference in cost of service between Tariff Customers and Cooperative Customers, and the finding of the Commission that they should be classified into two groups and charged differently is fully supported.

Stockton contends that it should be classified as a Cooperative Customer, rather than a Tariff Customer, and in support of its contention relies on evidence that its peak load requirements do not coincide with the peak load requirements of other Tariff Customers, and that the density of population in the area which it serves and other factors make it atypical of the other Tariff Customers. Stockton, on the record before us, is not identical to the other Tariff Customers, but it has enough of the characteristics of the other Tariff Customers as a group that we cannot say that Commission's conclusion that it should be classified as a Tariff Customer, or the finding that Stockton's relatively higher average charges are due to the small volume of its purchases, lack

such evidentiary support that they should be set aside.

The *Chicago Heights Trucking Co.* case, supra; L. T. Barringer & Co. v. United States, supra; Swayne & Hoyt, Ltd. v. United States, 300 U.S. 297, 57 S.Ct. 478, 81 L.Ed. 659 (1937); Manufacturers Ry. Co. v. United States, 246 U.S. 457, 38 S.Ct. 383, 62 L.Ed. 831 (1918); and Texas and Pacific R. Co. v. I. C. C., 162 U.S. 197, 16 S.Ct. 666, 40 L.Ed. 940 (1896), make clear that what is prohibited under the Federal Power Act is "undue" or "unreasonable" discrimination. In this case the Commission found that Delmarva had not unduly discriminated against its Tariff Customers by the rates it established for them. This finding is also supported by substantial evidence and is unassailable before us.

■ Public utility accounting science has not advanced to the point where, with certainty, every mill or fraction of a mill of the cost of a kwh of service can be ascertained with accuracy. Expert accountants vary in selecting the premises upon which their accounting studies are based with, at times, wide divergence among their results. The selection of a proper premise is thus a matter of informed judgment, and one obviously committed by Congress to the expertise of the Federal Power Commission. The Commission has latitude in the exercise of its discretion, and its conclusions are entitled to affirmance, provided, always, that there is substantial evidence in the record as a whole to support them.

These principles, translated to this case, result in the conclusion that the Commission did not transcend the authority delegated to it, and acted on substantial evidence in concluding that the rates were not unduly discriminatory. The record discloses that, in February, 1963, Delmarva voluntarily granted an annual $200,000.00 rate reduction to its Cooperative Customers. It was motivated by the fear that its Cooperative Customers, able to borrow money at a miniscule rate of interest under the provi-

sions of the Rural Electrification Act, might determine to construct its own generating facilities. In short, Delmarva recognized that the cost of service to it, including a fair return on its rate base, exceeded the value of service to its Cooperative Customers. Only three months later Delmarva voluntarily granted a $300,000.00 annual rate decrease to its Tariff Customers.

■ Manifestly, the loss of Cooperative Customers, which account for over 90% of Delmarva's annual revenues from wholesale sales, could have a crippling effect on Delmarva's ability to supply electrical energy to its Tariff Customers at rates which the Tariff Customers could afford to pay. Under such circumstances, where the initiation of rates is vested in the utility, subject to a determination by the Federal Power Commission that the rates are just and reasonable, and are not unduly discriminatory, Delmarva had the right to elect not to earn a rate of return which the Commission found fair, but which would have the potential effect of destroying its major wholesale market. By the same token, this evidence fully justified the Commission in deciding that the rate charged the Cooperative Customers, though less than the rate charged the Tariff Customers and one which earned a lesser rate of return than that earned on sales to Tariff Customers, was not *unduly* discriminatory. Additional support for the Commission's conclusion is found in differences in the cost of service for each of the two classes of customers previously discussed. Finally, the Commission found, and we determine these findings to be supported by the record, that the discrimination in rates was not shown to give to one person or locality an economic advantage over another. Although the Cooperative Customers enjoy the lower wholesale rate, the low density of their customers, with the attendant requirement of substantial investment in transmission lines, and the seasonal demand by a substantial portion of their customers, negatives their ability to compete with the Tariff Custom-

ers. In any event, the record shows that the Cooperative Customers and the Tariff Customers do not compete, except in the few instances where the Tariff Customers have offered consumers to the Cooperative Customers.

Finding the Commission's order supported by the record as a whole, we conclude that the petition to review be

Denied.*

---

* Judge BELL, who participated in this case and expressed himself in agreement with this conclusion, died before submission of the opinion to him.