The LONG ISLAND RAIL ROAD
COMPANY, Petitioner,

v.

The UNITED STATES of America, and
the Interstate Commerce Commission,
Respondents,

S & K Farms, Inc., and Freight Users
Association of Long Island, Inc.,
Intervening Petitioners,

Southern Pacific Transportation Company, the Atchison, Topeka and Santa Fe Railway Company, Missouri Pacific Railroad Company, St. Louis Southwestern Railway Company, and Union Pacific Railroad Company, Intervening Respondents.

No. 192, Docket 77–4118.

United States Court of Appeals,
Second Circuit.

Argued Oct. 19, 1977.
Decided Dec. 21, 1977.

Walter J. Mykowski, Washington, D. C. (George M. Onken, Richard H. Stokes, Jamaica, N. Y.), for petitioner.

Kenneth G. Caplan, Washington, D. C. (Mark L. Evans, Robert S. Burk, I. C. C., Washington, D. C., Robert L. Thompson, Andrea Limmer, U. S. Dept. of Justice, Washington, D. C.), for respondents.

George Carl Pezold, Huntington, N. Y. (Augello & Pezold, P. C., Huntington, N. Y.), for intervening petitioners.

John MacDonald Smith, San Francisco, Cal., Robert P. Shaughnessy, New York City, for intervening respondents.

Before LUMBARD, FEINBERG and VAN GRAAFEILAND, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

This is a petition by the Long Island Rail Road for review of an order of the Interstate Commerce Commission denying cancellation of a rate schedule filed by intervening-respondent railroads. It is the continuation of a running dispute between the LIRR and the intervening railroads, and some familiarity with the background is essential to an understanding of the issues.

When Congress passed the Railroad Retirement Amendments of 1973, Pub.L. 93–69, 87 Stat. 162, which increased substantially the taxes levied upon the railroads for the benefit of their employees' retirement system, it did not intend that the burden of this added impost should fall upon the railroads. *Long Island Railroad v.* *United States,* 388 F.Supp. 943, 944 (E.D.N. Y.1974); S.Rep.Nos. 202 & 221, 93d Cong., 1st Sess., *reprinted in* [1973] *U.S.Code Cong. and Admin.News,* pp. 1612, 1636, 1654–55. Accordingly, by the Railroad Rate Adjustment Act of 1973, Pub.L. 93–69, Title II, 87 Stat. 166, Congress created an expedited procedure whereby the railroads could obtain rate increases to recapture their added costs. See 49 U.S.C. § 15a(6).[1]

Acting as a group, most of the nation's railroads applied for and received a general increase in freight rates of 2.8%. *See Ex Parte No. 299, Increases in Freight Rates and Charges to Offset Retirement Tax Increases—1973,* 350 I.C.C. 673 (1975).[2] Because this change in rates was a uniform one, some railroads recovered more than their increased costs and some recovered less. Although the ICC recognized that this inequity existed, it refused to adopt a plan whereby excess revenues earned by the more fortunate roads would be pooled and paid to the less fortunate ones. *See Ex Parte No. 299, supra,* 350 I.C.C. at 676–77.

The LIRR, whose business is devoted primarily to intrastate passenger carriage,[3] would have recouped only a small portion of its retirement tax expense from a 2.8% increase in freight rates. For this reason, it refused to join the other roads in their united application—in railroad parlance, as used by the ICC, it "flagged out" of the proposed rate increase. Proceeding on its own, the LIRR secured Commission approval to impose a 12.5% "terminal surcharge" and to retain all the proceeds accruing therefrom. The product of this dichotomy in treatment has been protracted conflict and litigation.

1. Section 15a(6) provides in part that within thirty days of the filing of a petition by a carrier or a group of carriers, the ICC shall "permit the establishment of increases in the general level of the interstate rates of said carrier or carriers in an amount approximating that needed to offset increases in expenses theretofore experienced or demonstrably certain to occur" as a result of the Retirement Tax increases.

2. The ICC made specific findings and conclusions that the railroads were "in need of additional revenue from their interstate freight rates and charges to offset the increase in taxes, as a result of the Railroad Retirement Tax Act, as amended" and that "[w]ithout the additional revenues to be derived from increased freight charges, the earnings of [the railroads] would be insufficient to enable them under honest, economical and efficient management to provide adequate and efficient railroad transportation services consistent with the public interest and the national transportation policy." 350 I.C.C. at 717.

3. Approximately 90% of the LIRR's employees are engaged in passenger service.

The catalyst which combined with the terminal surcharge to bring about this unhappy state was a long accepted practice [4] of the Commission known as group-rating. Under this practice, multiple points of origin or of destination are grouped by areas, and uniform freight rates are applied to each area. This grouping of rates is thought to encourage competition among producers in an area, *Ayrshire Collieries Corp. v. United States,* 335 U.S. 573, 576, 69 S.Ct. 278, 93 L.Ed. 243 (1949), to effect equality of opportunity among both railroads and shippers, *The New York Harbor Case,* 47 I.C.C. 643 (1917), and to simplify the publication of tariffs, *The New England Divisions Case,* 261 U.S. 184, 198, 43 S.Ct. 270, 67 L.Ed. 605 (1923). Groups of long standing are presumably fair to all of the roads involved, *S. Bender Iron & Supply Co. v. Louisville & Nashville Railroad,* 173 I.C.C. 23, 24 (1931), and evidence as to traffic, operating conditions and tariff requirements of a group is deemed generally to be typical of its members. *Chicago & North Western Railway v. Atchison, Topeka & Santa Fe Railway Co.,* 387 U.S. 326, 342, 87 S.Ct. 1585, 18 L.Ed.2d 803 (1967); *The New England Divisions Case, supra,* 261 U.S. at 199, 43 S.Ct. 270. Although disruption of a group by an individual tariff filing is not unlawful per se, *see United States v. Chicago, Milwaukee, St. Paul & Pacific Railroad,* 294 U.S. 499, 507, 55 S.Ct. 462, 79 L.Ed. 1023 (1953); *Baltimore and Ohio Railroad v. United States,* 249 F.Supp. 712 (W.D.Pa. 1965), aff'd, 385 U.S. 3, 87 S.Ct. 32, 17 L.Ed.2d 2 (1966), such a filing will often be met by an ICC finding that the separate rate is "unjust and unreasonable" under § 1(5) of the Interstate Commerce Act, 49 U.S.C. § 1(5), or "unduly preferential" under § 3(1), 49 U.S.C. § 3(1). *See, e. g.,*

*Ayrshire Collieries Corp. v. United States, supra,* 335 U.S. at 587, 69 S.Ct. 278; *United States v. Chicago, Milwaukee, St. Paul & Pacific Railroad, supra,* 294 U.S. at 506, 55 S.Ct. 462; *Pennsylvania Railroad Co. v. United States,* 260 F.Supp. 536, 537 (E.D.Pa. 1965), aff'd, 382 U.S. 368, 86 S.Ct. 535, 15 L.Ed.2d 421 (1966).

The New York rate group, of which the LIRR is a member, has been in existence for many years. *See The New York Harbor Case, supra,* 47 I.C.C. at 712. LIRR's rate parity with this group would remain intact only if LIRR's 12.5% surcharge was not added onto the line haul charges applicable generally in the New York area. Prior to the proceeding under review, the LIRR was able to maintain substantial parity by flagging out of two general rate increases in which the other New York carriers participated, *Ex Parte No. 299, supra,* (2.8%) and *Ex Parte No. 305, Nationwide Increase of 10% in Freight Rates and Charges—1976,* I.C.C. (1977). When the LIRR's 12.5% surcharge was added to the rates which preceded these general increases, the total charges for traffic moving over its lines were approximately the same as the total charges for traffic moving over other lines in the New York area.

This meant, of course, that Western and Southern carriers who participate with the LIRR in long haul movements were unable to secure the benefit of the general rate increases that might otherwise have been applicable to the freight involved. To this extent, LIRR recouped its added retirement costs at the expense of these participating carriers. The Western and Southern lines have petitioned for review of the ICC orders permitting use of the 12.5% surcharge

---

**4.** "For many years before the enactment of Transportation Act, 1920, it had been necessary, from time to time, to adjudicate comprehensively upon substantially all rates in a large territory. When such rate changes were applied for, the Commission made them by a single order; and, in large part, on evidence deemed typical of the whole rate structure. This remained a common practice after the burden of proof to show that a proposed in-

crease of any rate was reasonable had been declared, by Act of June 18, 1910, c. 309, § 12, 36 Stat. 539, 551, 552, to be upon the carrier. Thus, the practice did not have its origin in the group system of rate-making provided for in 1920 by the new § 15(6)." *The New England Divisions Case,* 261 U.S. 184, 197–98, 43 S.Ct. 270, 276, 67 L.Ed. 605 (1923) (footnotes omitted).

in this manner, and that proceeding is now pending in the Fifth Circuit.[5]

What brings the parties before our Court is an unsuccessful attempt by the LIRR to follow the same general procedure in connection with the Southwestern Railroads' proposed upward revision of rates on fresh perishables moving in refrigerator cars out of the Southwest territory. Because the LIRR refused to concur in the new rate scale, i. e., flagged out, the rates could not be applied to destinations on that line. The other roads refused LIRR's request that they concur in separate rate levels for LIRR traffic which, when combined with its terminal surcharge, would result in a level of rates and charges to points on the LIRR approximately equal to the rates and charges to points on other railroads serving the New York City rate group area. Thereafter, at a hearing into the reasonableness and lawfulness of the new tariffs, the LIRR was permitted to intervene in order that it might challenge the validity of the proposed rates and seek Commission-prescribed rates for traffic over its own line. The Administrative Law Judge found that, although the rates under investigation were just and reasonable, they constituted "an unreasonable practice in violation of § 1(6)" and were "unduly prejudicial and preferential in violation of § 3(1)", because, when combined with the LIRR surcharge, they did "not make the total transportation charges paid by LIRR receivers the same as those paid by the other receivers in the New York City rate group."

Division Two of the Commission[6] refused to adopt this portion of the Administrative Law Judge's order, finding that: (1) the rates to points on the LIRR were lower than rates to other New York group points because the LIRR failed to join in the new rates; (2) the evidence failed to establish that the rates to points on the LIRR, when combined with the LIRR's surcharge, resulted in unequal total transportation charges in violation of §§ 1(6) and 3(1) of the Act; (3) the record did not show that receivers on the LIRR were unduly prejudiced by the difference in rates, and none appeared or otherwise complained that they were so prejudiced.[7]

Upon the refusal of the entire Commission to find that an issue of general transportation importance was involved, see 49 C.F.R. § 1100.101(a), the LIRR petitioned this Court for review.

■ It is well settled that the function of a reviewing court in cases such as this is extremely limited. See, e. g., Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). "Whether a preference or advantage or discrimination is undue or unreasonable or unjust is one of those questions of fact that have been confided by Congress to the judgment and discretion of the Commission . . . ," Manufacturers Railway Co. v. United States, 246 U.S. 457, 481, 38 S.Ct. 383, 389, 62 L.Ed. 831 (1918); and, unless the Commission's determination is arbitrary, capricious, or otherwise not in accordance with law, it will not be disturbed. See 5 U.S.C. § 706(2)(A). No such basis exists for overturning the order under review.

Division Two also noted that a divisions dispute between the LIRR and the other carriers was in progress and that, because of the new statutory procedures for handling divisions disputes, see 49 U.S.C. § 15(6), it was inappropriate for it to make any determination on this issue at that time.

Because the general question of divisions is presently under consideration by the Fifth Circuit in Aberdeen & R.R.R. v. United States, supra, n. 5, and it is not determinative of the issues herein, we need not address it.

---

5. *Aberdeen & R.R.R. v. United States*, Dkt. No. 77-1054 (5th Cir., argued Oct. 10, 1977). *Ed. note*: The 5th Circuit has now decided this matter. *Aberdeen & R.R.R. v. United States*, 565 F.2d 327 (5th Cir., 1977).

6. The Commission referred this case to its Division Two, which determined the case with all the jurisdiction and powers of the Commission. 49 U.S.C. § 17.

7. The intervening petitioners herein were not parties to the proceedings before the ICC but were permitted to intervene in the appeal by order of this Court.

Counsel for the LIRR concede in their reply brief that, at the hearings, the "LIRR made a statement of its position, but otherwise limited its participation in order not to prolong the hearings needlessly" and that "[n]o LIRR receivers intervened to complain." Apparently, counsel felt that the LIRR's previously approved surcharge, coupled with the practice of maintaining group rate integrity, made their position legally unassailable so that no proof was required. They also apparently concluded that the issue was predetermined by a prior Commission decision, *Sunkist Growers, Inc. v. Akron, Canton & Youngstown Railroad,* Dkt. No. 35960 (I.C.C. May 31, 1977), which required Western shippers of citrus fruits to publish separate rates for LIRR points which were approximately 12% below those for other New York area destinations. Their reliance on these factors was misplaced.

Although the right of the LIRR to impose a temporary terminal surcharge had been upheld previously,[8] the use of this surcharge to prevent "just and reasonable" rate increases by other roads was a matter of continuing controversy. In addition to *Aberdeen & Rockfish Railroad v. United States, see* note 5 *supra, Sunkist Growers* is also on appeal to the Fifth Circuit, *sub.nom. Atchison, Topeka & Santa Fe Railway v. ICC,* Dkt. No. 77–1946 (5th Cir., appeal docketed May 6, 1977). Petitioner must have been aware of the strong dissents in *Ex Parte No. 299 (Sub-No. 1)* by Commissioners Murphy and Clapp and of the Commission majority's admonition that the "unsatisfactory state of the tariffs" arising from the surcharge must be corrected. 350 I.C.C. at 713. Nonetheless, it once again followed the practice of flagging out of the proposed rate increases. It then sought

intervention in the subsequent rate hearing "so that if rates and charges are approved by the Commission herein for the rest of the New York, N.Y. rate group, appropriate rates and charges can be prescribed and made applicable to points on the LIRR simultaneously." Instead of prescribing new rates for the LIRR, the Administrative Law Judge cancelled the proposed tariffs in which the LIRR had refused to participate, finding that they constituted an unreasonable practice and were unduly prejudicial and preferential.

 These findings were required to be supported by substantial evidence before the Commission could accept them. *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); *ICC v. J–T Transport Co.,* 368 U.S. 81, 93, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961). They were not. The possibility that some disparity in rates might result from petitioner's decision to follow its own course did not, in and of itself, establish prejudice, preference or an unreasonable practice on the part of the intervening railroads. *See, e. g., A. Lindberg & Sons, Inc. v. United States,* 408 F.Supp. 1032, 1037–39 (W.D.Mich.1976); *Scott Paper Co. v. United States,* 372 F.Supp. 721, 732–33 (E.D.Pa.), *aff'd,* 419 U.S. 807, 95 S.Ct. 26, 42 L.Ed.2d 38 (1974). Indeed, the use of "arbitraries" for the assistance of weak lines is a common practice of the Commission. *See Official-Southern Divisions,* 287 I.C.C. 497, 522 (1953); *National Mortar & Supply Co. v. Pennsylvania Railroad,* 253 I.C.C. 176, 178 (1942); *Traffic Bureau, Lynchburg Chamber of Commerce v. Aberdeen & Rockfish Railroad,* 241 I.C.C. 487, 488 (1940). There was nothing in the record showing injury or preference to any person, including the LIRR, from the fact that the proposed tar-

---

8. In *Long Island R.R. v. United States, supra,* a three-judge court held that the LIRR's proposal to impose a 3.5% terminal surcharge, to be increased to 5.5% on January 1, 1974, was an appropriate method of effecting an "interim" rate increase under § 15a(4)(b), (recodified as § 15a(6)(b)), but expressed no view concerning its propriety as a final solution to the problem of recovering increased costs. Thereafter, the LIRR sought an increase in its "interim" termi-

nal surcharge from 5.5% to 12.5%, and this was granted by the Commission on December 6, 1974. In *Ex Parte No. 299, supra,* 350 I.C.C. at 713, 718, the Commission authorized the "temporary" continuance of the surcharge for a period of two years but stated that "ultimately there is no place for such provisions except in the rate tariffs naming the joint rates from and to the stations on the LIRR."

iff, applicable only to particular commodities, failed to include separate rates to destinations on the LIRR. *See Seaboard Airline Railroad v. United States,* 268 F.Supp. 500, 503–05 (E.D.Va.1967). Petitioner now may not assail the adverse determination of the Commission which resulted from the lack of proof.

■ Petitioner's argument that the decision of the Commission is inconsistent with its prior decision in *Sunkist Growers, supra,* is not persuasive. Where, as here, the Commission's determination is based upon lack of proof, alleged inconsistency between it and a prior decision is not a valid basis for reversal. *William N. Feinstein & Co. v. United States,* 317 F.2d 509, 512 (2d Cir. 1963).

■ There is no contention by any party hereto that intervening-respondents' new tariffs are unjust and unreasonable. Indeed, under 49 U.S.C. § 1(5)(b), the fact, as found, that the intervening-respondents did not have "market dominance" over the service involved precluded a finding that the rates were unjust or unreasonable. The tariffs must be upheld as lawful unless adequate reasons are presented for setting them aside. *United States v. Chicago, Milwaukee, St. Paul & Pacific Railroad, supra,* 294 U.S. at 510, 55 S.Ct. 462. Because the Commission could not have advanced any reasons supported by substantial evidence, its refusal to cancel the proposed tariffs was neither arbitrary, capricious, or in violation of law.

The petition for review is denied.[9]

9. We do not read the order of the Commission as a proscription against further efforts by the LIRR to alleviate its financial predicament. What relief, if any, will be granted to this troubled railroad will probably be determined to a large extent by the outcome of the litigation now pending in the Fifth Circuit.